CONOCO INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Vesta Energy Company,
et al., Intervenors.

Nos. 94–1724, 94–1726, 94–1729 to 94–1732,
94–1735, 95–1007, 95–1013, 95–1080,
95–1172, 95–1342 and 95–1364.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 16, 1996.

Decided Aug. 2, 1996.

R. Gordon Gooch, Washington, DC, argued the cause, for petitioners and intervenors in support of petitioners Conoco Inc., et al. Maria M. Seidler, Tulsa, OK, argued the cause, for petitioner Arkansas Royalty Membership. With them on the briefs were Dena E. Wiggins, Washington, DC, Emery J. Biro, III, Bruce A. Connell, Mickey J. Lawrence, Houston, TX, David M. Sweet, Steven R. Hunsicker, Randall S. Rich, Washington, DC, and Christopher J. Bernard, Cincinnati, OH. Mario M. Garza, Houston, TX, Susan B.

Dyer, Indianapolis, IN, Elisa J. Grammer, Monique L. Penn-Jenkins and Cheryl J. Walker, Washington, DC, entered appearances.

Richard D. Avil, Jr., Washington, DC, argued the cause, for petitioners and intervenors NorAm Gas Transmission Company, et al., with whom James E. Gauch, Washington, DC, Charles L. Pain, Petersburg, VA, Craig R. Rich and Mari M. Dugger, Tulsa, OK, were on the briefs.

Patricia L. Weiss, Attorney, Federal Energy Regulatory Commission, argued the cause, for respondent, with whom Jerome M. Feit, Solicitor, Washington, DC, was on the brief. Timm L. Abendroth, Attorney, Washington, DC, entered an appearance.

John H. Cheatham, III, Richard C. Green, Kenneth M. Minesinger, Washington, DC, Charles L. Pain, Petersburg, VA, Craig R. Rich, Mari M. Dugger, Tulsa, OK, Richard D. Avil, Jr. and James E. Gauch, Washington, DC, filed the brief on behalf of intervenors Interstate Natural Gas Association of America, et al. Jean E. Sonneman, Washington, DC, entered an appearance.

Daniel F. Collins, Washington, DC, entered an appearance, for intervenor ANR Pipeline Company. Peter G. Esposito entered an appearance, for intervenor Natural Gas Clearinghouse. Lawrence G. Acker and Brian D. O'Neill entered an appearance, for intervenors Trunkline Gas Company and Panhandle Eastern Pipe Line Company. Judy A. Johnson entered an appearance, for intervenor El Paso Natural Gas Company. David S. Berman entered an appearance, for intervenor NJR Energy Corporation. Steven A. Weiler entered an appearance, for intervenor NOARK Pipeline System. Gordon J. Smith entered an appearance, for intervenor PanEnergy Gas Services, Inc.

Patricia A. Curran, Houston, TX, entered an appearance, for amicus curiae, Cabot Oil & Gas Corporation.

Before: BUCKLEY, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

■ In these consolidated petitions for review of five orders of the Federal Energy Regulatory Commission,[1] the principal issue is whether a jurisdictional exemption was properly granted to an affiliate of an interstate pipeline for its gathering[2] service, which had formerly been operated by the pipeline itself, so long as the affiliate's gathering service functioned independently of the pipeline's transportation service, and so long as the affiliate provided the pipeline's existing customers contract protection during a two-year transition period. Producer petitioners ("the Producers")[3] challenge the Commission's determination that the facilities to be transferred were exempt gathering facilities under § 1(b) of the Natural Gas Act, 15 U.S.C. § 717(b) (1994).[4] The pipeline and gathering petitioners ("the Pipelines")[5] challenge the Commission's authority to require default contracts as a condition of the transfer. We conclude that there is substantial evidence to support the Commission's application of its primary function test[6] in determining that the gathering activity fell within the NGA § 1(b) exemption. We also conclude, however, that the Commission has not identified any source of authority to condition the transfer on Commission-prescribed default contracts with the pipeline's existing customers. Accordingly, we grant the Pipelines' petitions and deny the Producers' petitions, and we remand the cases to the Commission.

## I.

These appeals arise in the wake of major regulatory changes in the natural gas industry. Beginning in 1978, when Congress enacted the Natural Gas Policy Act, 92 Stat. 3350, 15 U.S.C. §§ 3301 et seq., to deregulate some wellhead price controls, market forces began to play a greater role in determining the supply, demand and price of natural gas. *Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd.*, 474 U.S. 409, 422, 106 S.Ct. 709, 716–17, 88 L.Ed.2d 732 (1986) ("*Transco*"). Following suit, the Commission, in 1985, promulgated Order No. 436,[7]

---

1. *Arkla Gathering Services Co.*, 67 F.E.R.C. ¶ 61,257 (1994) ("*Arkla I*"), order on reh'g, *Arkla Gathering Services Co.*, 69 F.E.R.C. ¶ 61,280 (1994) ("*Arkla II*"); reh'g denied, *Arkla Gathering Services Co.*, 70 F.E.R.C. ¶ 61,079 (1995) ("*Arkla IV*"); reconsideration denied, *Arkla Gathering Services Co.*, 71 F.E.R.C.¶ 61,297 (1995) ("*Arkla V*"). *Arkla Gathering Services Co.*, 70 F.E.R.C. ¶ 61,-018 (1995) ("*Arkla III*"), order on reh'g, *Arkla IV*, order on reh'g, *Arkla V*.

2. Gathering is the process of taking natural gas from the wells and moving it to a collection point for further movement through a pipeline's principal transmission system. *Northwest Pipeline Corp. v. FERC*, 905 F.2d 1403, 1404 n. 1 (10th Cir.1990).

3. Producer petitioners are Amoco Energy Trading Corporation, Amoco Production Company, Anadarko Petroleum Corporation, Arkansas Royalty Membership, Conoco Inc., Independent Petroleum Association of America, Marathon Oil Company, Oklahoma Independent Petroleum Association, Texaco Inc. and Texaco Natural Gas Inc.; producer intervenors are Exxon Corporation, Commissioner of Public Lands for the State of New Mexico, New Mexico Energy, Minerals and Natural Resources Department and Vesta Energy Company.

4. Natural Gas Act ("NGA" or "the Act"), 15 U.S.C. §§ 717– 717w (1994).

5. The pipeline and gathering petitioners are NorAm Field Services Corporation ("NorAm Field"), NorAm Gas Transmission Company ("NorAm Gas") and GPM Gas Corporation; pipeline and gatherer intervenors are Interstate Natural Gas Association of America, a pipeline trade association, and Williams Field Services Co., a gathering affiliate. At the time of the Commission's initial order, NorAm Field was known as Arkla Gathering Services Company, and NorAm Gas was known as Arkla Energy Resources Company. For ease of reference we refer to NorAm Field and NorAm Gas in this opinion.

6. *See Amerada Hess Corp.*, 52 F.E.R.C. ¶ 61,268 at 61,987–88 (1990); *see also infra* n.14.

7. Order No. 436, Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, [Regs. Preambles 1982–85] F.E.R.C. Stats. & Regs. (CCH) ¶ 30,665, order on reh'g, Order No. 436–A, [Regs. Preambles 1982–85] F.E.R.C. Stats. & Regs. (CCH) ¶ 30,675 (1985), order on reh'g, Order No. 436–B, [Regs. Preambles 1986–90] F.E.R.C. Stats. & Regs. (CCH) ¶ 30,688, order on reh'g, Order No. 436–C, 34 F.E.R.C. ¶ 61,404, order on reh'g, Order No. 436–D, 34 F.E.R.C. ¶ 61,405, order on reh'g, Order No. 436–E, 34 F.E.R.C. ¶ 61,403 (1986), aff'd in part and vacated and remanded in part sub nom. *Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C.Cir. 1987), cert. denied, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988).

which established a program of open-access, nondiscriminatory transportation by which gas distribution companies and industrial end-users could buy natural gas directly from gas merchants other than pipelines and ship that gas on interstate pipelines. *See Associated Gas Distributors v. FERC*, 824 F.2d 981, 996 (D.C.Cir.1987), *cert. denied*, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988). Then, in 1992, the Commission again altered the regulatory scheme in Order No. 636,[8] by mandating the unbundling of gas sales and interstate transportation that Order No. 436 simply encouraged, in order to give pipeline customers unimpeded access to the competitive wellhead market and to permit all gas sellers to compete on an equal basis. *See* 18 C.F.R. §§ 284.8(a)(1) & 284.9(a)(1)(1995); *United Dist. Companies v. FERC*, 88 F.3d 1105 (D.C.Cir.1996).

After Order No. 436, the Commission began to develop its policy regarding affiliate gatherers. *See Natural Gas Gathering Services Performed by Interstate Pipelines and Interstate Pipeline Affiliates—Issues Related to Rates and Terms and Conditions of Service*, 65 F.E.R.C. ¶ 61,136 at 61,689 (1993) (*"Gathering Service Policy"*). Although gathering is exempted from Commission jurisdiction by NGA § 1(b), the Commission required interstate pipelines that directly performed gathering services to file statements of their gathering rates as part of Order No. 436 enforcement.[9] After Order No. 636, the Commission did not require pipelines to include in their tariffs a gathering rate schedule, specifying the terms and conditions of the gathering services to be provided, but required the pipelines to file their separately stated gathering rates. *Gathering Service Policy*, 65 F.E.R.C. ¶ 61,136 at 61,689. In addition, as part of their Order No. 636 tariffs, pipelines must file statements that their gathering services are non-discriminatory, not unduly preferential,

and not inconsistent with the terms and conditions of the Part 284 certificates authorizing them to provide interstate transportation. *Id.*

The Commission also found that it had jurisdiction to regulate gathering services provided by pipeline affiliates in connection with the pipelines' interstate transportation in some circumstances. The Commission noted that it had taken the position that it had jurisdiction under NGA §§ 4 & 5, 15 U.S.C. §§ 717c, 717d (1994), to determine the justness and reasonableness of the rates, terms, and conditions under which gathering service is performed in connection with interstate transportation. It cited *Northern Natural Gas Co.*, 43 F.E.R.C. ¶ 61,473 (1988), *reh'g. denied*, 44 F.E.R.C. ¶ 61,384 (1988), and *Northwest Pipeline Co.*, 59 F.E.R.C. ¶ 61,115 (1992) (*"Northwest Pipeline I"*), *reh'g. denied*, 60 F.E.R.C. ¶ 61,213 (1992) (*"Northwest Pipeline II"*), *petitions for review dismissed*, *Williams Gas Processing Co. v. FERC*, 17 F.3d 1320 (10th Cir.1994). In *Northwest Pipeline II*,

> [t]he Commission expressed the view that the traditional form of regulation was not needed to address the mere potential for affiliate abuse, and that it would only regulate gathering rates of pipeline affiliates if shown by a complaint that more extensive Commission regulation is necessary to invalidate an unjust and unreasonable rate or to correct an unduly discriminatory practice in order to preserve its primary grant of authority over interstate transportation or sales.

*Gathering Service Policy*, 65 F.E.R.C. ¶ 61,136 at 61,690 (citing 60 F.E.R.C. ¶ 61,213 at 61,729). Thus, interstate pipeline affiliates are not required to file with the Commission their gathering rates, conditions of service, or any other statements. *Id.*

---

**8.** Order No. 636, Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under part 284 of the Commission's Regulations, and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, III F.E.R.C. Stats. & Regs. (CCH) ¶ 30,939, *order on reh'g*, Order No. 636–A, III F.E.R.C. Stats. & Regs. (CCH) ¶ 30,950, *order on reh'g*, Order No. 636–B, 61 F.E.R.C. ¶ 61,272 (1992), *reh'g denied*, 62 F.E.R.C. ¶ 61,007 (1993),

*aff'd in part and remanded in part, United Dist. Companies v. FERC*, 88 F.3d 1105 (D.C.Cir. 1996).

**9.** Order No. 436, at 42,493, 18 C.F.R. § 284.7(d) (1990), *cited in Northern Natural Gas Co. v. FERC*, 929 F.2d 1261, 1264 & n. 12 (8th Cir.1991).

The Commission acknowledged that there were differing views as to how (and even whether) gathering should be unbundled from interstate pipeline transportation. The Commission noted, for example, that under bundled firm-to-the-wellhead [10] rate design, "it is difficult for producers connected to other pipelines to compete." *Id.* On the other hand, some argued, "such rates are a logical extension of the Commission's requirement for SFV rates" mandated by Order No. 636, because firm-to-the-wellhead rate design removes fixed costs from usage rates in the production area and thus removes distortions in the choice among production connected to different pipelines.[11] *Id.* By early 1994, in an attempt to address new issues including those arising from proposals of interstate pipelines to "spin down" their gathering services to corporate affiliates or "spin off" their gathering services to a non-related corporate entity, the Commission convened a public conference to explore, among other things, the extent to which it should exercise its NGA §§ 4 & 5 authority over the rates, terms, and conditions of gathering services. *Id.* Ultimately, the Commission decided to address many of the issues with regard to gathering service performed by a pipeline affiliate on a case-by-case basis. *Arkla II,* 69 F.E.R.C. at 62,078 n. 5.

In late 1993, NorAm Gas Transmission Company ("NorAm Gas") sought to "spin down" to a separate affiliate, NorAm Field Services ("NorAm Field"), gathering facilities located at 105 sites in Arkansas, Louisiana, Oklahoma and Texas. NorAm Gas wanted its gathering facilities to operate on a level playing field with those of independent gatherers unregulated by the Commission. NorAm Field, the affiliate, petitioned the Commission for a declaratory order disclaiming jurisdiction over the affiliate's gathering facilities, services and rates. NorAm Field contended that its gathering services would be exempt pursuant to NGA § 1(b) and itself, as a non-natural gas company, exempt from the Act. In its petition, NorAm Field stated that NorAm Gas had classified all the facilities that would be transferred as gathering facilities, and that, upon acquisition of these facilities, NorAm Field would continue to provide the same gathering services, but "conduct its business organizationally separate from[NorAm Gas']." On this basis, NorAm Field maintained that after acquisition the facilities should be exempt from Commission jurisdiction under NGA § 1(b).

The Commission made a preliminary determination that the facilities to be transferred were gathering facilities within the NGA § 1(b) exemption. *Arkla I,* 67 F.E.R.C. ¶ 61,257 at 61,866. The Commission relied on NorAm Field's representation that it would operate the gathering systems in essentially the same manner as had NorAm Gas, and on the nature, size, and configuration of the facilities themselves. The Commission declined, however, to declare NorAm Field's facilities exempt without assurances against affiliate abuse and protection for NorAm Gas' existing gathering service customers. NorAm Gas was, therefore, required to include non-discriminatory and equal-access provisions in its tariff.[12] In light of what the Commission found were reasonable expectations of NorAm Gas' existing gathering customers that their service

---

10. Shippers who pay a firm-to-the-wellhead rate receive the right to firm transportation from the wellhead to their market delivery points. *Gathering Service Policy,* 65 F.E.R.C. ¶ 61,136 at 61,690.

11. In straight fixed/variable (SFV) rate design, fixed costs are allocated to the reservation or demand charge for firm transportation capacity, while variable costs are allocated to the usage or commodity charge for the actual transportation of gas. Order No. 636 adopted SFV rate design in place of modified fixed/variable (MFV) rate design, in which some fixed costs are allocated to the usage charge. *United Dist. Companies,* 88 F.3d. at 1129 & nn. 24–25.

12. Specifically, the Commission required NorAm Gas to file tariff provisions with assurances that it would (1) provide non-discriminatory access, and not give any preference to customers of NorAm Field over customers of nonaffiliated gatherers, in scheduling, transportation, storage or curtailment and (2) not condition or tie its agreement to provide transportation service to an agreement by the producer, customer, or shipper relating to any service provided by its gathering affiliate. The Pipelines do not challenge the non-discriminatory, open-access conditions.

would not be arbitrarily terminated in the event of a spin-down or spin-off, or offered only at unreasonable terms, conditions, and rates, NorAm Field was required to show that it negotiated private contracts with NorAm Gas' existing customers. If NorAm Field could not negotiate a contract with a customer, it must offer the customer a "default contract" containing terms not inconsistent with those currently offered by independent gatherers in the particular region.

The Commission pointed out that it had previously regulated rates for gathering services provided by interstate pipelines such as NorAm Gas as part of its review of the pipelines' bundled gathering and interstate transportation rates. *Arkla I*, 67 F.E.R.C. ¶ 61,257 at 61,872. In the Commission's view, "The pipelines' historical obligation to [their] gathering customers and the Commission's later requirement for open-access transportation created an expectation that the relationship between the pipelines and producers connected to their gathering systems would be governed by regulation, not private contract." *Id.* The Commission expressed concern that "in instances like the one here, where a pipeline is proposing to transfer its gathering operations to a nonpipeline entity, the existing customers could find themselves unable to contract for service of the pipeline's successor in interest." *Id.* With these concerns in mind, the Commission concluded that a "transition mechanism" was needed to ensure that "existing customers will not have their gathering service arbitrarily terminated," *Arkla II*, 69 F.E.R.C. ¶ 61,280 at 62,091–92, or "only offered [at] undue unreasonable terms, conditions and rates." *Arkla I*, 67 F.E.R.C. ¶ 61,257 at 61,872.

On rehearing, the Commission clarified that "when a pipeline seeks to transfer gathering facilities it must file under section 7 for abandonment authorization for any facilities that are certificated, and under section 4 to terminate service for both certificated and uncertificated facilities." *Arkla II*, 69 F.E.R.C. ¶ 61,280 at 62,083. The Commission also determined that the contract requirements for NorAm Gas' existing customers could be fulfilled by either NorAm Gas or NorAm Field, and specified that the new contracts must provide NorAm Gas' existing gathering customers two years' continued service at the same rate currently charged the customer for similar service, and at terms and conditions consistent with existing contracts or service. *Id.* at 62,092–94.

Thereafter, the Commission preliminarily accepted NorAm Gas' abandonment request, finally determined that the facilities were exempt gathering facilities, and provided further direction on the default contract issues. *Arkla III*, 70 F.E.R.C. ¶ 61,018 at 61,074–75. The Commission denied rehearing of its decision in *Arkla II*, and subject to a further default contract provision, granted abandonment and the request for a declaratory order. *Arkla IV*, 70 F.E.R.C. ¶ 61,079 at 61,223. Finally, the Commission denied rehearing of its order in *Arkla IV*, except as to the default contract issue, ordered a final revision to the contract, and issued its declaratory order contingent on the directed revision being made. *Arkla V*, 71 F.E.R.C. ¶ 61,297 at 62,170.

## II.

Under the NGA, the Commission has jurisdiction over the interstate transportation of natural gas, but not over the gathering of natural gas.[13] The line between jurisdictional transportation and nonjurisdictional gathering is not always clear. To draw that line, the Commission employs the "primary function test," which examines various factors to determine whether a facility is primarily devoted to gathering or to interstate transportation. The Producers contend that the Commission erred in three ways in condition-

---

13. Section 1(b) of the NGA provides that the Act

shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, *but shall not apply to* any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or *gathering of natural gas.*

15 U.S.C. § 717(b) (1994) (emphasis added).

ally granting NorAm Field's request for a declaratory order and NorAm Gas's request for permission to abandon the services. First, they contend that the Commission misapplied the primary function test, and that the finding that the spun down facilities are devoted to gathering was not supported by substantial evidence. Second, they maintain that even if the facilities provide gathering service, § 1(b) exempts only the physical activity of gathering from Commission regulation, and the Commission misinterpreted the NGA in declining to exercise authority over gathering rates. Finally, the Producers argue that the Commission's orders are internally inconsistent; if, as the Commission found, it would have jurisdiction to regulate NorAm Field's gathering services in the event of anticompetitive collusion between NorAm Field and NorAm Gas, say the Producers, then NorAm Field's services must be jurisdictional and cannot fall within the § 1(b) exemption. We are not persuaded by any of these arguments.

■ The primary function test is a set of factors that tend to indicate whether a facility is devoted to the collection of gas from wells—gathering—or to the further ("downstream") long-distance movement of gas after it has been collected—interstate transportation.[14] The test requires the Commission to "assess and weigh all of the specific facts and circumstances present in a given system." *West Texas Gathering Co.*, 45 F.E.R.C. ¶ 61,386 at 62,221 (1988). Several criteria are relevant, particularly the physical, geographical, and operational aspects of the facilities, but no factor is determinative,

nor do all factors apply in every situation. *Northwest Pipeline Corp. v. FERC*, 905 F.2d 1403, 1408 (10th Cir.1990); *Farmland Industries*, 23 F.E.R.C. ¶ 61,063 at 61,143; *see also Arkla I*, 67 F.E.R.C. ¶ 61,257 at 61,867.

■ The Producers fault the Commission's application of the primary function test in this instance. The Producers maintain that the Commission went astray because it "denied parties the opportunity to develop a full and specific record," "examined only superficially the various ... factors" of the primary function test, and failed to examine the function of individual facility segments "as part of an integrated whole."[15] The Commission, the Producers assert, further misapplied the primary function test with respect to three criteria: the compressors; the central point in the field test; and the web-like configuration of many of the facilities. Specifically, the Producers contend that the Commission did not develop a record to examine whether the compressors functioned to further downstream transportation, failed to specify those areas to which it found the central point in the field test applicable or adduce record evidence showing that the test was satisfied, and ignored how the facilities in different areas operated interdependently to further interstate transportation.

■ The Producers' complaints notwithstanding, we find that the Commission's determination that the facilities are primarily devoted to gathering is supported by the record. The Commission examined six factors.[16] It found, first, that the pipelines were

**14.** The primary function test was articulated by the Commission in *Farmland Industries, Inc.*, 23 F.E.R.C. ¶ 61,063 at 61,143 (1983), and later modified in *Amerada Hess Corp.*, 52 F.E.R.C. ¶ 61,268 at 61,987–88 (1990). *Louisiana Intrastate Gas Corp. v. FERC*, 962 F.2d 37, 42–43 (D.C.Cir.1992). The parties to these proceedings fault only the Commission's application of the test, and do not dispute that the primary function test is a reasonable construction of the Commission's authority under NGA § 1(b) and merits deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**15.** The Producers' contention that the Commission erred in denying them an evidentiary hearing to develop a full record in support of their

position that the facilities function as an integrated part of the transmission system is meritless. The Commission concluded that there were no disputed material issues of fact that could not be resolved on the written record, *Arkla II*, 70 F.E.R.C. ¶ 61,079 at 61,221, and the Producers have not shown the contrary. The court has repeatedly held that the Commission "is required to hold hearings only when the disputed issues may not be resolved through an examination of written submissions." *Environmental Action v. FERC*, 996 F.2d 401, 413 (D.C.Cir.1993) (citations omitted).

**16.** The six factors are: (1) the length and diameter of the relevant lines; (2) the extension of the facility beyond the central point in the field; (3) the lines' geographic configuration; (4) the loca-

generally short in length and small in diameter, which is indicative of gathering usage. *Arkla I,* 67 F.E.R.C. ¶ 61,257 at 61,867. All except 15 of the 3,138 pipeline segments to be transferred are less than 8 miles in length; ninety percent of the pipelines are less than 6 inches in diameter and, except for pipelines at one location, all are less than 10 inches in diameter. *Id.* Second, the Commission found that many of the subject areas satisfy the central point in the field test.[17] The few exceptions are small fields with limited well connections and small diameter pipelines, or pipelines forming backbone-type structures. Third, the Commission observed that the facilities' three types of geographic configuration, particularly the web-like configuration, are consistent with a gathering determination. Fourth and fifth, the Commission noted that the minimal compression used and the location of numerous wells along the facilities are also consistent with gas gathering. *Id.* at 61,867.[18] Last, the Commission found that the majority of subject areas operate at low pressure, which is similarly indicative of gathering. *Id.* at 61,-868. From these findings, the Commission concluded that all 105 systems qualified as exempt gas-gathering systems under NGA § 1(b). *Id.* at 61,869.

■ The Commission may not "disregard those facts or issues that prove difficult or inconvenient" or "refuse to come to grips" with certain evidence in applying the primary function test. *See Tenneco Gas v. FERC,* 969 F.2d 1187, 1214 (D.C.Cir.1992). The record reflects that the Commission, in fact, "treat[ed] fully 'each of the pertinent factors,' " *see id.* (quoting *Public Serv. Comm'n of New York v. FPC,* 511 F.2d 338, 345 (D.C.Cir.1975)), and made specific findings with respect to the location of compressors upstream of processing plants, the applicability of the central point test to some areas, and the system's web-like geographical configuration. 67 F.E.R.C. ¶ 61,257 at 61,867–69. Unlike *Louisiana Intrastate Gas,* 962 F.2d at 42–43, where the court remanded because the Commission's decision was not based on the primary function test and lacked reasoned consideration, the Commission here gave reasoned consideration to each of the pertinent factors of the primary function test, articulating conclusions based on factual findings. The Producers identify no critical evidence that would undermine the Commission's decision. In evaluating and balancing the several factors under the primary function test, the Commission brings to bear its considerable expertise about the natural gas industry. *See Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Motor Vehicle Manufacturers Ass'n of United States v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989). Consequently, in view of the substantial evidence to support the Commission's findings, there is no basis for the court to substitute its judgment for that of the Commission.

■ The Producers next contend that the Commission incorrectly expanded the scope of the § 1(b) gathering exemption to deregulate the rates, terms, and conditions for gathering service, contrary to prior Supreme Court decisions that held § 1(b)'s

---

tion of compressors and processing plants; (5) the location of wells along all or part of the facility; and (6) the operating pressure of the lines. The first five factors were relied on by the Commission in *Farmland Industries, Inc.,* 23 F.E.R.C. ¶ 61,063, and *West Texas Gathering Co.,* 45 F.E.R.C. ¶ 61,386; the sixth factor was considered in *Amerada Hess Corporation et al.,* 52 F.E.R.C. ¶ 61,268.

17. Gathering generally involves the collection of gas from separate wells at a single point, the "central point in the field." There, it is delivered into a single line for interstate transportation. The central point in the field test examines whether the facilities in question are upstream of this single point, in which case they are likely to be gathering facilities, or downstream, in which case they are likely to be transportation facilities.

18. The facilities at issue consist of approximately 2,775 miles of pipelines that are attached to approximately 3,900 active wells, 2,000 additional wells that flow gas through interconnections with third-party gatherers, and another 1,300 wells that are presently either inactive or split connected and producing into competitors' gathering systems. *Id.* at 61,864.

exclusion applicable only to the physical activities of gathering. The Commission's interpretation of § 1(b) is entitled to *Chevron* deference. *Oklahoma Natural Gas Co. v. FERC,* 28 F.3d 1281, 1283–84 (D.C.Cir.1994) (citing *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The Supreme Court decisions cited by the Producers have addressed the Commission's jurisdiction over gathering rates charged only by interstate pipelines, and thus do not control the question whether the Commission may regulate rates charged by independent or pipeline-affiliated entities. Further, the statute itself does not clearly resolve the question one way or the other, and the Commission's interpretation is a permissible resolution of the ambiguity.

The Producers rely on several Supreme Court decisions and a decision from the Eighth Circuit for the proposition that § 1(b)'s exemption should be restrictively construed to apply only to the physical activities of gathering.[19] The Supreme Court "has consistently held that 'production' and 'gathering' are terms narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution." *Northern Natural Gas Co. v. Kansas Corp. Comm'n,* 372 U.S. 84, 90, 83 S.Ct. 646, 649–50, 9 L.Ed.2d 601 (1963). However, in each case in which the Court has applied this narrow definition of "production" and "gathering" to uphold the Commission's jurisdiction, the regulated entity was engaged in jurisdictional activity. Thus, when a natural gas company provided bundled sales and interstate transportation from its own wells to consumers and distributors, the Commission could properly include the company's production and gathering costs in its rate base for the bundled service. *Colorado Interstate,* 324 U.S. at 603, 65 S.Ct. at 839–40. That holding expressly depended upon the company's jurisdictional sales, however; the case does not stand for the proposition that the Commission can regulate the rates

charged by any gatherer. Similarly, the Court held that the Commission could regulate an independent producer's gas sales, but did so because the producer was engaged in a jurisdictional activity, namely sales for resale, not because the Commission has general rate-making authority over producers. *Phillips Petroleum,* 347 U.S. at 682, 74 S.Ct. at 799. The Court has also held that the Commission may regulate curtailment of gas deliveries by interstate pipelines, even to direct-sales customers apparently excluded by another of § 1(b)'s exemptions, because of the Commission's authority over the pipelines' jurisdictional transportation. *FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 642–47, 92 S.Ct. 1827, 1839–42, 32 L.Ed.2d 369 (1972).

What the Court has not done is to recognize Commission jurisdiction over entities performing neither jurisdictional sales nor jurisdictional transportation. The Commission was confronted in the instant case with two questions that the Court has not answered: (1) Does the Commission have jurisdiction over the rates charged by a gatherer that does not transport gas interstate nor engage in jurisdictional sales? and (2) If not, does the Commission nonetheless have jurisdiction if the gatherer is affiliated with a jurisdictional pipeline? The decisions relied on by the Producers predate the massive reorganization of the industry occasioned by Orders Nos. 436 and 636, and the Court has not yet addressed many of the jurisdictional issues governing this restructured system.

The Supreme Court introduced the concept of the "physical" activity of gathering when pipelines bundled together jurisdictional and nonjurisdictional activities. Under these circumstances, the Court upheld the reach of federal rate-making regulatory jurisdiction to include both activities, focusing on the fact that the activity was a part of interstate transportation or sale by a natural

---

19. *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 678, 74 S.Ct. 794, 796–97, 98 L.Ed. 1035 (1954); *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 600–02, 65 S.Ct. 829, 838–39, 89 L.Ed. 1206 (1945); *Interstate Natural Gas Co. v. FPC,* 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742 (1947); *Northern Natural Gas Co. v. FERC,* 929 F.2d 1261 (8th Cir.1991), *cert. denied,* 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991). *But see FPC v. Panhandle Eastern Pipe Line Co.,* 337 U.S. 498, 506–07, 69 S.Ct. 1251, 1256–57, 93 L.Ed. 1499 (1949) ("*Panhandle III*").

gas company.[20] In this context the Court defined "gathering" narrowly, as limited to activities preceding sales for resale. *Phillips Petroleum,* 347 U.S. at 678, 74 S.Ct. at 796–97 (citing *Colorado Interstate,* 324 U.S. at 598, 65 S.Ct. at 837). The Commission did not reject the physical/nonphysical distinction made by the Court in the context of bundled service, but simply declined to apply it in a different factual and regulatory situation not contemplated by the Court's prior rationale. The Supreme Court has to date recognized only the Commission's authority to consider gathering costs "for the purposes of determining the reasonableness of rates subject to its jurisdiction." *Colorado Interstate,* 324 U.S. at 603, 65 S.Ct. at 839; *see also Panhandle III,* 337 U.S. at 506, 69 S.Ct. at 1257 ("[t]he use of such data for rate making is not a precedent for regulation of any part of production or marketing."). The Producers did not ask the Commission to regulate derivatively and merely "tak[e] into account the production properties and gathering facilities of natural gas companies when it fixes their [bundled] rates." *Colorado Interstate,* 324 U.S. at 604, 65 S.Ct. at 840. Rather, they sought to have the Commission directly regulate unbundled gathering rates charged by a non-natural gas company. Consequently, we find no inconsistency between the Supreme Court precedents and the Commission's determination that the gathering services at issue fall within NGA § 1(b)'s exemption.

The Producers' reliance on *Northern Natural,* 929 F.2d 1261, is no more availing.[21] In that case, the Eighth Circuit upheld the Commission's jurisdiction to enforce the Order No. 436 requirement that interstate pipelines separately identify their costs attributable to bundled gathering services. As that court recognized, such jurisdiction was indistinguishable from the rate-setting authority recognized in *Colorado Interstate.* *Id.* at 1269. The only difference was that after Order No. 436, the gathering service was no longer bundled with jurisdictional sales, the jurisdictional "hook" relied on in *Colorado Interstate.* Gathering was still bundled with interstate transportation, however, and because "[s]ection 1(b) grants jurisdiction over interstate transportation and over interstate sales in the same words," there was no reason to come to a different result. *Id.*

The Producers rely on dictum in *Northern Natural* in an attempt to extend its holding—and that of *Colorado Interstate*—to cover the instant case. The Eighth Circuit concluded that the Commission "[m]ay ... under the NGA's §§ 4 and 5, regulate rates charged for gathering on the pipeline's own gathering facilities in connection with jurisdictional interstate transportation, notwithstanding the explicit § 1(b) exclusion of gathering from the act." *Id.* A footnote earlier in the decision defined " 'gathering facilities owned by the pipeline' and all substantially similar expressions ... to include such facilities owned or operated directly or indirectly by a pipeline or its parent, *affiliate,* subsidiary or lessors." *Id.* at 1263 n. 2 (emphasis added). The Producers thus take the position that the Commission's conclusion here, that it lacks jurisdiction over NorAm Field's gathering facilities, conflicts with *Northern Natural* and is in error. Because the Eighth Circuit did not have before it a situation like the one that confronts us in the instant case, it did not have to consider the full ramifications of its footnote. It did not discuss the issue of the jurisdictional status of affiliate-run gathering service, and it thus provides little persuasive authority on that issue. The court noted that "[t]he question is not before us of whether gathering performed by producers or independent gatherers for transportation in interstate commerce by an interstate pipeline is sufficiently connected to interstate transportation to justify

---

**20.** *See Colorado Interstate,* 324 U.S. at 602–03, 65 S.Ct. at 839–40; *Public Util. Comm'n of Colorado v. FERC,* 660 F.2d 821, 826 (1981) ("[T]he Supreme Court on numerous occasions has held that FERC ... may take into consideration nonjurisdictional items when setting jurisdictional rates."), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982).

**21.** The Producers, in support of their *Northern Natural* argument, refer to the Tenth Circuit's decision in *Colorado Interstate Gas Co. v. FERC,* 83 F.3d 1298 (10th Cir.1996). Because the Tenth Circuit's decision involves the Commission's authority over gathering services performed by an interstate pipeline, not an affiliate, it is distinguishable for the same reasons as is *Northern Natural.*

rate regulation under §§ 4 & 5." *Id.* at 1274. Hence, the language in *Northern Natural* cannot be construed to indicate that the Eighth Circuit intended its dictum in footnote two, referring to an "affiliate," to apply to an independently operated gathering affiliate. Instead, the support for the Producers' position to be found in *Northern Natural* lies in the fact that the rationale underlying the Eighth Circuit's decision—namely, the perceived danger that unregulated pipeline gathering rates might pose to effective regulation of transportation rates—is reflected in the Commission's orders under review.[22] In light of such concerns, the Commission determined that NorAm Gas' gathering affiliate would be exempt from NGA jurisdiction only so long as the affiliate maintains an independent, arms-length relationship with the interstate pipeline. But *Northern Natural* provides no direct support for the Producers' more expansive claim that the Commission can regulate the gathering activities of the independent affiliate.

Thus, the Commission had some leeway in construing the NGA's jurisdictional provisions in the first instance, as there was no controlling judicial precedent. *Cf. Louisiana Power,* 406 U.S. at 631–36 & n. 12, 92 S.Ct. at 1833–36 & n. 12 (considering efficacy of state regulation in construing Commission's jurisdiction and noting differing regulatory interests of gas-producing and gas-consuming states); *Northern Natural Gas Co. v. Kansas Corp. Comm'n,* 372 U.S. at 90, 83 S.Ct. at 649–50 (noting limitation of production and gathering exemption to physical acts). Having determined that the gathering facilities

fell within § 1(b)'s gathering exemption, the Commission concluded that it has no jurisdiction over an affiliate gatherer so long as the affiliate operates independently of the interstate pipeline and performs only non-jurisdictional activities. *Arkla I,* 67 F.E.R.C. ¶ 61,257 at 61,870; *Arkla II,* 69 F.E.R.C. ¶ 61,280 at 62,086–87. The Commission found that "[a] pipeline affiliate that does not itself provide any jurisdictional sales or transportation services, is not a natural gas company under the NGA." *Arkla II,* 69 F.E.R.C. ¶ 61,280 at 62,086. Indeed, a company is not a "natural gas company" within the meaning of NGA § 2(6), 15 U.S.C. § 717a(6) (1994),[23] and hence not subject to the provisions of NGA §§ 4, 5 and 7, 15 U.S.C. §§ 717c, 717d, and 717f, unless the company either transports gas in interstate commerce or makes sales in interstate commerce of such gas for resale. It was within the scope of *Chevron* deference for the Commission to conclude that the NGA "shall not apply" to rates charged by a company providing only gathering services. Section 1(b) contemplates that some measure of authority over gathering should be reserved to the states, and jurisdiction over companies whose sole business is gathering is a permissible place to start.

Finally, the Producers challenge the Commission's conclusion that an independently operated affiliate, solely providing gathering services, would be exempt from the Commission's NGA §§ 4 & 5 authority to review rates, even though the Commission also reserved the right to exercise such authority if the affiliate should engage in anticompetitive behavior.[24] The purposes of the

---

**22.** The Eighth Circuit stated that:

Permitting a pipeline to manipulate the otherwise unregulated charges for gathering services performed over its own facilities in connection with jurisdictional interstate transportation, would, in effect, permit the *pipeline* to establish rates for interstate transportation. Thus the pipeline could grant forbidden preferences in interstate transportation for its own gas, to the disadvantage of third-party shippers.

929 F.2d at 1270.

**23.** Section 2(6) defines "natural gas company" to mean:

a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

15 U.S.C. § 717a(6).

**24.** Section 4(a) provides that:

All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

15 U.S.C. § 717c(a) (1994). Section 5(a) provides in relevant part that:

Whenever the Commission, after a hearing ... shall find that any rate, charge, or classification demanded, observed, charged, or collected

NGA would be subverted, the Producers contend, if an interstate pipeline could avoid NGA jurisdiction over the rates, terms, and conditions of its gathering service simply by spinning down its gathering facilities to an affiliate. According to the Producers: "the Commission cannot have it both ways. Either it has jurisdiction over the gathering service spun down to the affiliate or it does not. By asserting the potential of future exercise of jurisdiction, the Commission is acknowledging that it has jurisdiction." [25]

In its answer to protests filed in opposition to its petition for a declaratory order of exemption from NGA §§ 4 & 5 regulation, NorAm Field proposed, as an alternative, that the Commission only apply light-handed regulation of the affiliate's rates and services through future complaint mechanisms, if necessary. *Arkla I,* 67 F.E.R.C. ¶ 61,257 at 61,865. This, in effect, is what the Commission has done. *Id.* at 61,871; *Arkla II,* 69 F.E.R.C. ¶ 61,280 at 62,089–90. Recognizing that purportedly independent affiliates could circumvent the purposes of the NGA, the Commission took two preventive steps. First, "to guard against the risk of affiliate

abuse, and to ensure an arms length relationship" between NorAm Gas and NorAm Field, it required NorAm Gas to add open-access, non-discrimination, and anti-tying provisions to its tariff. *See supra* n. 12. Second, the Commission noted that certain types of "affiliate abuses"—including the giving of preferences and discounts to the affiliate's benefit, and other anticompetitive activity—would "trigger the Commission's authority to disregard" the affiliate's separate corporate structure. *Arkla I,* 67 F.E.R.C. ¶ 61,257 at 61,871. Such circumstances, the Commission concluded, would empower it to "treat the pipeline and gatherer as a single entity," and thereby "regulate the gathering activities as it would if the gathering facilities were owned directly by an interstate pipeline." *Id.* [26]

In sum, the Commission's position is that notwithstanding a gatherer affiliate's separate status under state corporation law, the affiliate may lose its status as an independent entity for purposes of the Act if it engages in anti-competitive activity with its affiliated pipeline. In a prior case involving a similar

by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission ... is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force and shall fix the same by order.
15 U.S.C. § 717d(a) (1994).

25. The Producers further contend that the Commission's decision is inconsistent with its later holdings that jurisdiction cannot be defeated where affiliated companies operate as one interstate pipeline. *See KansOk Partnership v. Williams Natural Gas Co.,* 73 F.E.R.C. ¶ 61,160 (1995), *order granting stay in part,* 73 F.E.R.C. ¶ 61,293 (1995); *Louisiana Gas System Inc. v. Panhandle Eastern Corp.* 73 F.E.R.C. ¶ 61,161 (1995). In *KansOk* and *Louisiana Gas,* the Commission exercised jurisdiction over chains of interconnected intrastate affiliates that collectively functioned as interstate pipelines. By contrast, the Commission found NorAm Field exempt from NGA jurisdiction because it will engage in nonjurisdictional gathering. Hence, we find no inconsistency. As the Producers admit, "[i]t is one thing to argue that a non-jurisdictional affiliate can be created to perform non-jurisdictional activities," as NorAm Field seeks to do, and "it is another thing to allow a jurisdictional activity

... to become a non-jurisdictional activity through the creation of an affiliate," as the Commission refused to allow in *KansOk* and *Louisiana Gas.*

26. The Commission explained in its initial decision:

While the Commission generally does not have jurisdiction over affiliated gatherers because affiliates are not natural gas companies under the NGA, the Commission can exert control over the gathering activities of affiliated gatherers in particular circumstances where such action is necessary to accomplish the Commission's policies for the transportation of natural gas in interstate commence. More specifically, if an affiliated gatherer acts in concert with its pipeline affiliate in connection with the transportation of gas in interstate commerce and in a manner that frustrates the Commission's effective regulation of the interstate pipeline, then the Commission may look through, or disregard, the separate corporate structures and treat the pipeline and gatherer as a single entity, *i.e.,* a single natural gas company. In so doing, the Commission would regulate the gathering activities as it would if the gathering facilities were owned directly by an interstate pipeline.
*Arkla I,* 67 F.E.R.C. ¶ 61,257 at 61,871.

spin-down to a pipeline's subsidiary, the Commission had relied on

> [t]he general rule ... that an agency may disregard the corporate form in the interest of public convenience, fairness, or equity. This principle of allowing agencies to disregard corporate forms is flexible and practical in nature. Corporations may be regarded as one entity for the purposes with which the agency is immediately concerned even though they are legitimately distinct for other purposes.

*Northwest Pipeline I,* 59 F.E.R.C. ¶ 61,115 at 61,435 (quoting Opinion No. 255, 37 F.E.R.C. ¶ 61,149 at 61,356 (1986)). In the instant case, the Commission similarly concluded that while it has

> no authority to regulate an affiliated gatherer because it is not a natural gas company under the NGA ... if circumstances develop that would allow the pipeline and its affiliated gatherer to engage together in anticompetitive activity, the Commission will exert jurisdiction over the gathering service to the extent needed to preserve the Commission's statutory mandates under the NGA.

*Arkla II,* 69 F.E.R.C. ¶ 61,280 at 62,087 (citing *Northwest Pipeline I,* 59 F.E.R.C. ¶ 61,115 at 61,435–36). In other words, while the Commission believes it has no jurisdiction over gathering provided by a truly independent affiliate, it also holds that its jurisdiction over interstate transportation obligates it to ensure that there is no collusion between the interstate pipeline and the gatherers to manipulate the interstate market by determining who will have access to it. As with its treatment of the physical/nonphysical distinction, the Commission has rejected the Producers' request to regulate gathering rates directly and continuously, but has distinguished exceptional situations in which its regulation of interstate transportation would include regulation of gathering rates. In this sense, the Commission's position on this issue, far from being inconstant with its overall analysis, parallels its treatment of gathering in general. For instance, while the Commission does not believe it has the general authority to regulate gathering rates, it has never renounced its authority under *Colorado Interstate* to include gathering costs in the rate base for bundled sales or interstate transportation service. Thus, the Commission consistently maintains that when gathering is intertwined with jurisdictional activities, the Commission's regulation of the latter may necessarily impinge on the former.

It is in this light that we interpret the Commission's suggestion in its brief to the court that its exercise of jurisdiction over gathering affiliates is a discretionary matter entitled to judicial deference.[27] The Commission, if its jurisdictional analysis is correct, must determine in each instance whether the affiliate's behavior calls for federal intervention. As an abstract matter, we have no reason to doubt the Commission's conclusion that a nonjurisdictional entity could act in a manner that would change its status by enabling an affiliated interstate pipeline to manipulate access and costs of gathering, the precise concern of the Eighth Circuit in *Northern Natural,* 929 F.2d at 1270, *supra* n. 22. Furthermore, we are not in a position to evaluate this question other than as an abstract matter because the Commission has yet to assert its jurisdiction over a gathering affiliate. Both here and in *Northwest Pipeline I & II,* the Commission concluded that its stand-by jurisdiction was not called for under the circumstances. As suggested by the Tenth Circuit's decision to dismiss for want of a case or controversy the affiliate's petition in *Northwest Pipeline,* we cannot speculate about what circumstances might develop in the future that would cause the Commission to invoke the authority it seeks to reserve in the instant case. *Williams Gas Processing Co. v. FERC,* 17 F.3d 1320, 1321–22 (10th Cir.1994). For now we conclude only that, as a conceptual matter, the Commission's position is not internally contradictory.

---

**27.** The Commission states in its brief that the "regulation of gathering rates is a matter delegated to the Commission to be determined in its discretion, and in this case, the Commission rea-

sonably concluded that jurisdiction over [NorAm Field's] gathering rates is currently not called for."

Accordingly, we deny the Producers' petitions challenging the Commission's determination that the gathering facilities at issue are exempt under NGA § 1(b).

### III.

The Pipelines, in turn, attack the default contract condition, contending that the Commission exceeded the scope of "the express jurisdictional limitation on its powers contained in § 1(b) of the NGA."

Originally, the Commission found the authority to impose the default contract condition in its NGA § 7(b) power to determine whether the abandonment of facilities under its jurisdiction is in the public convenience and necessity.[28] The order in *Arkla I* differed from the later orders in imposing the condition directly on NorAm Field, rather than NorAm Gas. Twenty percent of the gathering facilities that NorAm Gas proposed to transfer to NorAm Field had been certificated pursuant to NGA § 7(c) when NorAm Gas included the facilities in year-end budgetary certificate reports.[29] *Arkla II*, 69 F.E.R.C. ¶ 61,280 at 62,085. *See also Arkla I*, 67 F.E.R.C. ¶ 61,257 at 61,872. The Commission required NorAm Gas to file an abandonment application pursuant to § 7(b), despite NorAm Gas' protestation that the "mistakenly" certificated facilities were non-jurisdictional and hence not subject to the Commission's abandonment authority.[30] The Commission also ordered NorAm Gas to include specific non-discrimination standards in its interstate transportation tariff, and required NorAm Field to demonstrate that it had negotiated private contracts with NorAm Gas' existing gathering customers or offered them default contracts.

On rehearing, the Commission modified its approach in two respects. First, the Commission shifted the default-contract filing requirement from NorAm Field to NorAm Gas, disavowing any intention to impose a standard of conduct or otherwise regulate a non-jurisdictional entity.

> [W]e will require that either NorAm [Gas] or [NorAm Field] demonstrate that [NorAm Field] has negotiated private contracts with [NorAm Gas'] existing customers. If such a demonstration cannot be made ... NorAm [Gas] may submit a "default contract" or *pro forma* agreement which [NorAm Field] has offered to [NorAm Gas'] existing customers.

*Arkla II*, 69 F.E.R.C. ¶ 61,280 at 62,083. While continuing to find the public convenience and necessity dependent on dealings between NorAm Field and gathering service customers, the Commission placed the onus of warranting those dealings on NorAm Gas. Second, the Commission concluded that the condition was required not only by § 7(b) as it applied to the twenty percent of the facilities that were certificated, but also to all of the facilities, certificated or not, pursuant to

---

**28.** Section 7(b) provides that:

> No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

15 U.S.C. § 717f(b) (1994).

**29.** As a precondition to operation, a natural gas company must receive a certificate of public convenience and necessity from the Commission. Section 7(c)(1)(A) provides:

> No natural-gas company ... shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission ...

or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations.

15 U.S.C. 717f(c)(1)(A) (1994).

**30.** On rehearing, the Commission affirmed the § 7(b) filing requirement, notwithstanding NorAm Gas' objection that it had mistakenly included nonjurisdictional facilities in its year-end budget certificate reports. *Arkla II*, 69 F.E.R.C. ¶ 61,280 at 62,085. The Commission reasoned that in so reporting these facilities, and benefitting from "the advantages bestowed by ... certification," such as the ability to attract customers through the stability of service implied by a certificate and the possibility of including the facilities' costs in NorAm Gas' bundled-service rate base, NorAm Gas had committed itself to seeking Commission authority to abandon

NGA §§ 4 & 5. *Id.* at 62,082–83. Specifically, the Commission found that NorAm Gas' plan to cease providing gathering service in connection with its interstate transportation service constituted a "change in service," thus requiring a § 4(d) filing.[31] In § 4(e), the Commission found the authority to impose conditions necessary to make the proposed change just and reasonable.[32] The Commission concluded that an abrupt change in the regulatory status of NorAm Gas' gathering services would be unreasonable and unjust under §§ 4 and 5 because it would immediately eliminate NGA price and access protection upon which customers had come to depend. *Id.* at 62,082. In so concluding the Commission relied as well on "well established continuity of services principles."[33] *Id.* at 62,083. For it to find in the § 7(b) proceeding that the facilities abandonment was in the public convenience and necessity, and that the termination of service in the § 4 proceeding was just and reasonable, the Commission required NorAm Gas to "demonstrate that its existing customers will be guaranteed service after the facilities are transferred." *Arkla IV*, 70 F.E.R.C. ¶ 61,079 at 61,219.

The Commission rejected the Pipelines' argument that it was beyond the scope of NGA jurisdiction to require NorAm Field, a nonjurisdictional entity, to execute gathering agreements with NorAm Gas' existing customers. *Arkla II*, 69 F.E.R.C. ¶ 61,280 at 62,081. The Commission's principal response was that permitting NorAm Gas to terminate its gathering services without adequate protection would frustrate the policy of promoting a competitive market, and that the Commission could use its § 4 authority to regulate nonjurisdictional activities performed "in connection with" jurisdictional service to prevent that outcome. The Commission noted that one of the goals of Order No. 636, namely to "ensure that all shippers have meaningful access to the pipeline transportation grid" in order to promote "competitive, national market" transactions, would be

them. *Id.*; *Arkla V*, 71 F.E.R.C. ¶ 61,297 at 62,164–65.

31. Section 4(d) provides:

Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

15 U.S.C. § 717c(d) (1994).

32. Section 4(e) provides, in pertinent part:

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission or gas distributing company, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect.... At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

15 U.S.C. § 717c(e) (1994).

33. Although these principles were developed in connection with assessing the public convenience and necessity of § 7(b) abandonment of certificated facilities and services, the Commission concluded that similar principles must apply when addressing the termination of non-certificated jurisdictional services. *Arkla II*, 69 F.E.R.C. ¶ 61,280 at 62,083 n. 42.

advanced by its assertion of "in connection with" authority in light of the Eighth Circuit's decision in *Northern Natural,* 929 F.2d 1261. *Id.* at 62,081 (citations omitted). As the Commission itself had concluded on another occasion:

> the section 4 and 5 grant of authority to regulate activities "in connection with" interstate transportation gives the Commission the discretion to regulate other aspects of the natural gas industry where necessary to make effective the Commission's primary jurisdiction over interstate transportation.

*Northwest Pipeline II,* 60 F.E.R.C. ¶ 61,213 at 61,729 (quoting *Northwest Pipeline I,* 59 F.E.R.C. ¶ 61,115 at 61,435–36 (quoting NGA §§ 4 and 5)). Or, as the Commission argues in its brief to the court, although "the *physical* gathering activities which [NorAm Field] will perform are exempt from the Commission's jurisdiction under § 1(b) ... that is not to say they are also free of the Commission's term and rate authority under §§ 4 and 5." Brief for Respondent at 19 (citing *Northern Natural,* 929 F.2d at 1263). Applying the reasoning in *Northern Natural,* the Commission further concluded that failing to review the termination of gathering services here would create potential obstacles to open-access transportation by providing pipelines with the opportunity to grant undue preferences or advantages, and enable pipelines, in effect, to assume the Commission's congressionally-assigned role in determining whether rates are fair and just and whether proposed action by a pipeline is in the public interest. *Arkla II,* 69 F.E.R.C. ¶ 61,280 at 62,082.

The Commission had several other responses to the Pipelines' objection. In its view, "a natural corollary to the requirement to file ... gathering rates is a requirement to submit for Commission review any proposal to change—or in this case to terminate— some or all of the rates or services embodied in the rates." *Id.* at 62,081–82. Also, concluding that "the states are not in a position to protect the expectations of existing customers at the point the pipeline decides to exit from the market for gathering," the Commission sought to avoid a "regulatory gap" contrary to congressional intent in enacting the NGA. *Id.* Finally, in the Commission's view, it was not engaged in continuing regulation of NorAm Field, since once the gathering facilities were transferred and the contracts for continuity of service were in place, the Commission's involvement in these proceedings would be over. *Arkla IV,* 70 F.E.R.C. ¶ 61,079 at 61,219.

 We conclude that the Commission has not identified any source of authority to impose the default contract condition. Granting the Commission's statutory interpretation due deference, the statute forecloses what appears to be the principal justification offered by the Commission: that the phrase "in connection with" in § 4 permits it to regulate facilities that it has expressly found are not within its § 1(b) jurisdiction. Where an activity or entity falls within NGA § 1(b)'s exemption for gathering, the provisions of NGA §§ 4, 5 and 7, including the "in connection with" language of §§ 4 and 5, neither expand the Commission's jurisdiction nor override § 1(b)'s gathering exemption. In language no less applicable here, the Supreme Court held in *Panhandle III,* 337 U.S. at 508–09, 69 S.Ct. at 1257–58, that

> [s]ections 4, 5 and 7 do not concern the producing or gathering of natural gas; rather, they have reference to the interstate sale and transportation of gas and are so limited by their express terms. Thus §§ 4(a), (b), (c), 5(a) and 7(c) speak of "transportation or sale of natural gas subject to the jurisdiction of the Commission" while § 7(a) and (b) refer respectively to "transportation facilities" and "facilities subject to the jurisdiction of the Commission." Nothing in the sections indicates that the power given to the Commission over natural-gas companies by § 1(b) could have been intended to swallow all the exceptions of the same section and thus extend the power of the Commission to the constitutional limit of congressional authority over commerce.

*See also Colorado Interstate,* 324 U.S. at 602–03, 65 S.Ct. at 839–40. Because the Commission concluded that the facilities to be transferred by NorAm Gas were exempt under § 1(b) as gathering facilities, and that NorAm Gas' independently operated affiliate

gatherer was not a "natural gas company" subject to the NGA, the Commission cannot simply assert authority over the facilities and the affiliate by invoking other sections of the Act.[34]

Nor are the Commission's other explanations for asserting §§ 4 & 5 authority adequate. Although a § 4(d) change-in-service filing may seem a "natural corollary" to the requirement to file gathering rates, what is natural may not always be part of the Act, and the Commission must explain how the NGA effectuates this corollary. The "regulatory gap" argument, depending on the inability of the states to protect existing customers, finds support in Supreme Court authority. *E.g., Louisiana Power,* 406 U.S. at 631, 92 S.Ct. at 1833–34. Nonetheless, the Commission did not explain why the states would be unable to protect NorAm Gas' customers, nor why the purported gap would be a two-year problem. Finally, the fact that the Commission's involvement would end once the contracts between NorAm Field and the NorAm Gas customers were signed does not explain why the Commission has the jurisdiction to be involved in the first place.

Likewise, there are difficulties with the Commission's reliance on § 7(b). As previously discussed, §§ 4, 5, & 7 do not expand the Commission's § 1(b) jurisdiction. Section 7(b) requires approval for abandonment of "facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities." This provision is no more an expansion of jurisdiction than is the "in connection with" language of § 4. In any event, while the record is not absolutely clear on the point, it appears that only twenty percent of the facilities to be transferred by NorAm Gas were ever certificated. As the Commission itself recognized, even if the abandonment authority could be invoked, it could apply to only that portion of the facilities. *Arkla I,* 67 F.E.R.C. ¶ 61,257 at 61,872.

Although we conclude.that the Commission did not adequately explain its jurisdiction to condition approval of the spin-down of gathering facilities on a default contract mechanism, the Commission's options for assuring continuity of service and reasonable rates for gathering customers are not necessarily exhausted. There may be other alternatives that the Commission has not as yet explored, and we do not pre-judge whatever efforts or determinations it may make in the future to address the spin-down phenomenon. In the orders under review, the Commission relied on an impermissible statutory interpretation to impose the default contract condition. Accordingly, we grant the Pipelines' petitions, deny the Producers' petitions, and remand the cases to the Commission.

---

**34.** Our concern with the Commission's statutory interpretation is reenforced by *Northwest Central Pipeline v. State Corp. Comm'n,* 489 U.S. 493, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989) (finding no preemption of a state law regulating natural gas production). There, the Court, observing that Congress "carefully divided up regulatory power over the natural gas industry" so as to "expressly reserv[e] to the States the power to regulate ... gathering," *id.* at 509–514, 109 S.Ct. at 1273–76, held that "[t]o find preemption of [a state's] regulation merely because .purchasers' costs and hence rates might be affected would be largely to nullify that part of NGA § 1(b) that leaves to the States control over production," *id.* at 514, 109 S.Ct. at 1276. The Court expressly cautioned once again against interpreting the Commission's powers over transportation and sales to include those areas reserved to the states. *Id.* at 512, 109 S.Ct. at 1275 (quoting *Panhandle III,* 337 U.S. at 513–14, 69 S.Ct. at 1260).