IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 96-60536

---

SEA ROBIN PIPELINE COMPANY;

                                                        Petitioner,

WILLIAMS GAS PROCESSING – GULF COAST COMPANY;
TRANSCONTINENTAL GAS PIPE LINE CORPORATION

                                                        Intervenors

                              versus

FEDERAL ENERGY REGULATORY COMMISSION;

                                                        Respondent

PRODUCER-MARKETER TRANSPORTATION GROUP;
INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA;
TOTAL MINATOME CORPORATION;
ENERGY DEVELOPMENT CORPORATION;
EXXON CORPORATION; TEXACO NATURAL GAS INC;
SHELL GAS TRADING COMPANY; PHILLIPS
PETROLEUM COMPANY AND PHILLIPS GAS
MARKETING COMPANY ("PHILLIPS");
MURPHY EXPLORATION AND PRODUCTION COMPANY;
MARATHON OIL COMPANY;
AMOCO PRODUCTION COMPANY AND
AMOCO ENERGY TRADING CORPORATION ("AMOCO");
ANADARKO PETROLEUM CORPORATION,

                                                        Intervenors

---

Petition for Review of an Order of
the Federal Energy Regulatory Commission

---

October 23, 1997

Before POLITZ, Chief Judge, HIGGINBOTHAM and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In 1995, the Sea Robin Pipeline Company petitioned the Federal Energy Regulatory Commission for a declaration that Sea Robin's facilities perform a "gathering" function rather than a "transportation" function, thus exempting them from the Commission's jurisdiction under Section 1(b) of the Natural Gas Act, 15 U.S.C. § 717(b). The Commission, in denying the petition, determined that Sea Robin was engaged in jurisdictional transportation activities as opposed to gathering. The Commission denied Sea Robin's petition for rehearing. Sea Robin then petitioned this Court for review. We are persuaded that the Commission gave inadequate attention to the physical and operational facilities of Sea Robin in applying its primary function test. We grant the petition for review, vacate FERC's order and remand the case to the Commission. On remand, the Commission may again consider the applicability of the primary function test to offshore pipeline systems and, if necessary, reformulate this test.

I.

The physical specifications of Sea Robin's pipeline system are central to deciding whether it is a transportation or a gathering facility. Sea Robin's pipeline system is located entirely offshore in the Gulf of Mexico and approximately 90% of its facilities lie in water depths of less than 140 feet. The system is configured in the form of an inverted "Y" with two arteries stretching roughly

2

southwest and southeast from a central point about fifty miles south of the Louisiana coast. These two pipelines collect raw gas from fifty-seven offshore production platforms. Sea Robin's Vermillion 149 Compressor Station stands at the intersection of these two pipelines. It compresses the gas from the fifty-seven platforms for travel north, up the inclined seabed, to the Erath Compressor Station on the mainland. After collecting gas from four more platforms, the system terminates near Erath, Louisiana, where the gas is separated, dehydrated and processed. The Erath Compressor Station then prepares the gas for delivery to downstream transmission pipelines at five nearby entry points.

The Sea Robin system consists of 438 miles of dual-phase[1] pipelines with a capacity to transport 1.26 billion cubic feet of gas per day (Bcf/day) and includes around 69,500 hp of compression. The total compression horsepower at the Vermillion 149 Station is 37,050 hp and is 32,490 hp at Erath, Louisiana. Of the 438 miles of pipes, 339 miles are larger than twenty inches in diameter. The remaining ninety-nine miles of pipes, mostly running from individual platforms to the larger pipes, are between four and sixteen inches in diameter. The longest segment is the Vermillion 149-Erath section, consisting of 66.3 miles of thirty-six inch diameter pipeline running in a straight line from Sea Robin's Vermillion compressor station to onshore processing facilities. The four platforms along this section are within twenty-five miles

---

[1] The pipeline is "dual-phase" in that it carries a raw stream of natural gas and liquid hydrocarbons taken directly from the gas wells.

of the Vermillion compressor station, which means that the last forty-one miles of the thirty-six inch diameter pipeline are uninterrupted by lateral pipe segments. The gas and liquefiables delivered by Sea Robin meet the merchantable natural gas quality standards of downstream transmission pipelines.

## II.

Section 1(b) of the Natural Gas Act, 15 U.S.C. § 717 et seq., governs "the transportation of natural gas in interstate commerce." See 15 U.S.C. § 717(b) (1988). In Section 1(b) Congress prescribed not only "the intended reach of federal power, but also specif[ied] the areas into which this power was not to extend." Northwest Central Pipeline Corp. v. State Corp. Comm'n, 489 U.S. 493, 510, 109 S.Ct. 1262, 1274, 103 L.Ed.2d 509 (1989) (quoting FPC v. Panhandle E. Pipe Line Co., 337 U.S. 498, 503, 69 S.Ct. 1251, 1255, 93 L.Ed. 1499 (1949)). This Section expressly exempts from the Commission's jurisdiction "the production or gathering of natural gas."[2] Thus, Congress "carefully divided" FERC's regulatory power and "did not envisage federal regulation of the entire natural-gas industry field to the limit of constitutional power. Rather it contemplated the exercise of federal power as specified in the Act." Id.

---

[2] See Christian S. Gerig, Appalachian Natural Gas and FERC. Order 636: The Deregulation Dilemma, 24 Cap. U. L. Rev. 761, 762-63 (1995) (describing the three components of the natural gas industry, namely, gathering, transmission, and distribution).

Further, the Supreme Court has consistently held that "exceptions to the primary grant of jurisdiction in Section 1(b) are to be strictly construed," Interstate Natural Gas Co. v. FPC, 331 U.S. 682, 690-91, 67 S.Ct. 1482, 1487, 91 L.Ed 1742 (1947), and the terms "production" and "gathering" are to be "narrowly confined to the physical acts of drawing the gas from the earth and preparing it for the first stages of distribution." Northern Natural Gas Co. v. State Corp. Comm'n, 372 U.S. 84, 90, 83 S.Ct. 646, 649-50, 9 L.Ed.2d 601 (1963) (collecting cases); see also Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Bd., 474 U.S. 409, 418, 106 S.Ct. 709, 714-15, 88 L.Ed.2d 732 (1986); Natural Gas Pipeline Co. v. Railroad Comm'n, 679 F.2d 51, 53-54 (5th Cir. 1982); Hamman v. Southwestern Gas Pipeline, Inc., 721 F.2d 140, 143 (5th Cir. 1983).

In the past, the Commission has employed three different tests, namely, the behind-the-plant test, the central-point test, and the primary function test, to determine whether a company's facilities qualify for the gathering exemption. Angela S. Chitwood-Beehler, A Conflict in the Circuits: The FERC's Jurisdiction Over Gathering Rates, 13 Energy L.J. 375, 382 (1992). The behind-the-plant test treats a system as a gathering facility if it is located behind the gas processing plant which treats the product coming from that area. Id.; In re Phillips Petroleum Co., 10 F.P.C. 246, 277 (1951), overturned on other grounds by Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). The central-point test involves a determination of

5

where the separate and various lateral lines bring gas to a central point for delivery into a single line.  Angela S. Chitwood-Beehler, supra at 382; Barnes Transportation Co., Inc., 18 F.P.C. 369 (1957).

More recently, the Commission rejected any bright-line approach that employs a single, dispositive factor in favor of a multi-factor, primary function test that analyzes the totality of the facts and circumstances in a given case.  In other words, under the primary function test, the Commission determines whether, with reference to the specific facts and circumstances of the particular facility in question, its primary function is gathering.  EP Operating Co. v. FERC, 876 F.2d 46, 48 (5th Cir. 1989).  Applying this test in Farmland Industries, Inc., 23 FERC ¶ 61,063 (1983), the Commission identified five salient factors in determining whether a pipeline is a gatherer or a transporter:

(1) the diameter and length of the facility;

(2) the location of compressors and processing plants;

(3) the extension of the facility beyond the central point in the field;

(4) the location of wells along all or part of the facility; and

(5) the geographical configuration of the system.

Id. at 61,143.  The Commission later added a sixth factor:  the operating pressure of the line.  EP Operating Co., 876 F.2d at 48. No single Farmland factor is dispositive in the Commission's consideration of the facts and circumstances of a given case.  See

6

Northwest Pipeline Corp. v. FERC, 905 F.2d 1403, 1408 (10th Cir. 1990).

In 1990, after this court's decision in EP Operating Co. v. FERC, 876 F.2d 46 (5th Cir. 1989), the Commission noted that "because of recent advances in engineering and available technology, offshore drilling operations continue to move further offshore and further from existing interstate pipeline connections," and hence it would assess "the continuing viability and relevance of the 'primary function' test to current industry conditions." Amerada Hess Corp., 52 FERC ¶ 61,268 (1990). The Commission then proposed "a sliding scale which [would] allow the use of gathering pipelines of increasing lengths and diameters in correlation to the distance from shore and the water depth of the offshore production area." Id. at 61,988. The Commission also stated that, in addition to the Farmland factors, it would take into account non-physical criteria such as:

(1) the purpose, location and operation of the facility;

(2) the general business activity of the owner of the facility; and

(3) whether the jurisdictional determination is consistent with the objectives of the Natural Gas Act and the Natural Gas Policy Act.

Id.

III.

A.

An agency determination may be set aside if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); EP Operating Co., 876 F.2d at 48. The fundamental precept that permits this deferential standard of review is that "an agency must cogently explain why it has exercised its discretion in a given manner" and "must supply a reasoned analysis" for any departure from other agency decisions. Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 48, 57, 103 S.Ct. 2856, 2869, 2874, 77 L.Ed.2d 443 (1983).  However, "a court is not to substitute its judgment for that of the agency" or "supply a reasoned basis for the agency's action that the agency itself has not given."  Id. at 43, 103 S.Ct. at 2867 (quoting SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)).

Treating the first Farmland factor, the length and diameter of the facility, the Commission decided that "based on the *very large size* of [Sea Robin's] system, th[e] demarcation between gathering and transmission [was] clearly evident.  In other words, the length and diameter of the system's components, as well as its overall size, [we]re not outweighed by other elements of the 'primary function' test."  Sea Robin Pipeline Co., 71 FERC ¶ 61,351, 62,398 (1995) (emphasis in original).

Then the Commission examined other elements of the primary function test.  It concluded that the behind-the-plant factor was

8

of "little relevance," and the reality of how gas is processed on the outer continental shelf (OCS) reduced the weight accorded to this factor. Id. at 62,401. Similarly, the Commission found the central point in the field factor "to be of limited importance with regard to isolated OCS operations"; the operating pressure to be a "neutral criteria in applying the primary function test to OCS facilities"; the location of wells factor[3] to be "not determinative"; and the geographical configuration of Sea Robin's system to be simply "in large part a function of the location of areas in the OCS that were in need of transportation services." Id. at 62,401-02.

The Commission repeatedly emphasized that the non-physical criteria in its test supported its conclusion that Sea Robin was a transporter, particularly Sea Robin's prior certification as a jurisdictional pipeline and its ownership by an interstate pipeline, the Southern Natural Gas Company, as opposed to a producer of gas. Finally, the Commission urged that granting gathering status to Sea Robin would amount to deregulation of the entire natural gas pipeline system on the outer continental shelf.

---

[3] The Commission urges that we have no jurisdiction to review its orders with regard to the location of wells Farmland factor since Sea Robin did not challenge its orders with respect to this particular factor. We find that the record establishes that Sea Robin did raise this objection adequately in its petition for rehearing to satisfy the requirements of 15 U.S.C. § 717r(b).

Sea Robin's system resists easy categorization because the logistics of offshore pipelines obscures differences between gathering gas from Gulf platforms and transporting it to the mainland. Since it is not feasible to process raw gas on open water, entities like Sea Robin do not have an opportunity to gather the gas at a local, centralized point to prepare it for traditional transportation. Instead, they must construct large pipes to carry (often over a hundred miles away) the raw gas from offshore rigs to the shore for processing. In short, the pattern of gathering and distribution on shore differs from the pattern of transportation and gathering of gas from the middle of the Gulf to the mainland. See Edwin I. Malet, Outer Continental Shelf Oil Pipelines Under The Interstate Commerce Act, 43 La. L. Rev. 1143, 1172-73 (1983) (noting that it "is unclear whether or under what circumstances the business of 'gathering' may be considered a transportation service subject to regulation.... Indeed, most, if not all, offshore oil movement might be characterized as gathering."). Nevertheless, Section 1(b) of the Natural Gas Act requires that the Commission reckon with this statutory distinction between gatherers and transporters and provide a framework for making a meaningful distinction between the two, in the context of offshore pipelines.

It appears that the very size of Sea Robin's system led the Commission to conclude presumptively that it is a transportation facility. In so doing, the Commission retracted its prior acknowledgment that the efficiencies associated with moving large

volumes of gas to shore may require the use of large diameter pipelines.  The Commission abandoned, without reasoned consideration, its "sliding scale" of Amerada Hess that would "allow the use of pipelines of increasing lengths and diameters in correlation to the distance from shore and the water depth of the production area."  Instead, the Commission reverted to its single factor, bright-line approaches that it had previously rejected as unworkable for offshore pipelines.  See Northwest Pipeline Corp., 905 F.2d at 1409 (noting that a reasoned analysis of the primary function test must eschew the application of any overarching bright line standards); EP Operating Co., 876 F.2d at 48.

The Commission purported to work through all the factors in its primary function test.  Yet it excluded at least four factors on grounds that they did not shed light on the problem because of the distinctive considerations involved in retrieving gas from the outer continental shelf.  The Commission found that over half of its own physical Farmland factors were not probative in the offshore context and should therefore be excluded without any application to the Sea Robin system.  While we recognize that every factor in the primary function test may not apply in every situation, by excluding consideration of a large number of the Farmland factors, the Commission, in effect, reduced the primary function analysis to a litmus test that turned on the length and diameter of the overall system.

The Commission must apply consistently its primary function test and not discount, without reasoned analysis, application of

11

any factor which points to a non-jurisdictional result.  It may not "disregard those facts or issues that prove difficult or inconvenient" or "refus[e] to come to grips" with certain results in applying the primary function test.  Tenneco Gas v. FERC, 969 F.2d 1187, 1214 (D.C. Cir. 1992).

Relatedly, the Commission's accent on business purpose, ownership, and prior certification status misses the basic thrust of the primary function test -- making a technical distinction between gathering and transportation based on the physical and operational characteristics of a pipeline facility.  See Northwest Pipeline Corp., 905 F.2d at 1407 n.10, 1410 (noting that "the production and gathering exemption applies to the physical activities, facilities, and properties used in the production and gathering of natural gas and not to the business of production and gathering" and a company's "status in interstate transportation cannot alone transform the character of [its] facilities") (citations omitted).  Congress made its policy choices regarding the reach of regulation.  It did not make these choices by defining goals and objectives, leaving their implementation to the administrative agency.  Rather, Congress drew a distinction based on the physical patterns of the industry, gathering versus transporting.  It is this Congressional choice that demands that the Commission define its jurisdictional reach in distinctions between gathering and transporting.  If the Commission is to remain tethered to the statute, as it must, that inquiry must be based primarily on physical criteria and the realities of the field.  The

inquiry cannot be cut loose to locate a different inquiry that Congress might have directed had it foreseen the offshore development and the patterns emerging from deregulation. It is a statute we are construing.

Further, the Commission's emphasis on ownership may be called into question in light of its recent practice of allowing pipeline companies to spin-off affiliated gatherers and thus make them non-jurisdictional. See, e.g., Pacific Gas & Elec. Co. v. FERC, 106 F.3d 1190, 1196-97 (5th Cir. 1997), cert. denied, 66 U.S.L.W. 3254 (U.S. Oct. 6, 1997) (No. 96-1847); Conoco, Inc. v. FERC, 90 F.3d 536 (D.C. Cir. 1996), cert. denied, 117 S.Ct. 1017 (1997) (both allowing a wholly-owned gathering facility to escape FERC jurisdiction). In short, general business activity and prior certification are relevant, but they are only part of the mix. We do not intend to cast a shadow on the Commission's OCS Policy Statement regarding consideration of non-physical criteria. See 74 FERC at ¶ 61,759. Rather, we intend that it be put in its place as considerations secondary to the physical factors. The determinative question is when did gathering cease and transportation commence. Non-physical factors must be relevant to this question.

The Commission raises the potential for a "regulatory gap" problem by urging that if Sea Robin is found to be a gathering system, then other large gas transporters may seek similar declarations, thus upsetting the investment-backed expectations of producers and shippers who have come to rely upon the Commission's

13

exercise of regulatory authority.  Need for regulation cannot alone create authority to regulate.  Commission jurisdiction must be defined by first turning to a reasoned application of the primary function test.  See Northwest Pipeline Co., 905 F.2d at 1412.  We do not suggest that the formulation of a primary function test must be blind to its consequences.  But the look at consequences is not the beginning point; it is a reality check.

On remand, the Commission may reformulate its primary function test.  It may choose to discontinue criteria not relevant to the physical, geographical and operational characteristics of pipelines in the OCS.  The record suggests other criteria, such as the quality of gas in the pipelines and the depth of the water in the offshore production area, that may be relevant to the inquiry. Finally, Sea Robin may choose to respond to the Commission's invitation to offer portions of its system as predominantly involved in a gathering or a transportation function.[4]  Discomfort in drawing the jurisdictional line at points internal to an overall system may be soothed with the reminder that Congress did not intend to extend FERC's jurisdiction to all natural gas pipelines; indeed it demands the drawing of jurisdictional lines, even when the end of gathering is not easily located (consider, for example,

---

[4]  The Commission declined to address Sea Robin's request urging the Commission to find "at a minimum Sea Robin's facilities at and upstream of the Vermillion 149 platform...be declared to be non-jurisdictional gathering  facilities under the NGA", because the request was not part of the original petition.  The Commission noted that its decision was without prejudice.  See 75 FERC ¶ 62,084 n.90.

a distinction between the field south of the Vermillion Compressor Station and the pipelines leading north to Erath, Louisiana).

## IV.

The Commission has failed to supply the requisite reasoned analysis in applying its primary function test. We GRANT the petition for review, VACATE the Commission's order and REMAND the case for further consideration by the Commission. On remand, the Commission may reconsider the applicability of the factors in its primary function test to offshore pipeline systems and then, if necessary, reformulate this test.

VACATED AND REMANDED.