Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 12, 2003          Decided June 20, 2003

No. 01-1327

WILLIAMS GAS PROCESSING—GULF COAST COMPANY, L.P. AND
TRANSCONTINENTAL GAS PIPE LINE CORPORATION,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

DYNEGY MARKETING AND TRADE, ET AL.,
INTERVENORS

———

Consolidated with
02–1006, 02–1007, 02–1051, 02–1052, 02–1053, 02–1072,
02–1073, 02–1074, 02–1075, 02–1076

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Thomas J. Eastment* argued the cause for petitioners/intervenors Producer. With him on the briefs were *Joshua B.*

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Frank, James M. Costan, T. Alana Deere, Timothy J. Jacquet, Joseph E. Mixon, Frederick T. Kolb, Douglas W. Rasch*, and *Charles J. McClees, Jr. Linda L. Geoghegan* entered an appearance.

*Joseph S. Koury* argued the cause for petitioners/intervenors Williams Gas Processing – Gulf Coast Company, L.P., et al. With him on the briefs were *James T. McManus, Mari M. Ramsey, Gisela B. Cherches* and *David A. Glenn.*

*David H. Coffman*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Transcontinental Gas Pipe Line Corp. ("Transco") petitioned the Federal Energy Regulatory Commission ("FERC") for approval to transfer some of its pipeline facilities to its affiliate, Williams Gas Processing – Gulf Coast Co. ("WGP"), and to certify that the facilities serve gathering rather than transmission functions. FERC approved the applications in part and denied them in part, and Transco and WGP now challenge the portions of the orders that denied the requests, contending that FERC's assertion of jurisdiction is contrary to precedent regarding the exemption of gathering facilities under the Natural Gas Act ("NGA"), 15 U.S.C. § 717(b) (2000). A coalition of natural gas producers ("the Producers") also petitions the court for review, objecting to those portions of FERC's orders that granted the abandonment and reclassification of facilities as gathering for lack of a reasoned determination and as contrary to the public interest. Our review of these petitions is instructed by *ExxonMobil Gas Marketing Co. v. FERC*, 297 F.3d 1071, 1084 (D.C. Cir. 2002), where the court stated that it will defer to FERC's reasonable determinations regarding

gathering status under NGA section 1(b), 15 U.S.C. § 717(b). We hold that petitioners fail to demonstrate that FERC's choices are "unreasonable and its chosen line[s] of demarcation [are] not within a 'zone of reasonableness' as distinct from the question of whether the line[s] [are] 'precisely right.'" *ExxonMobil*, 297 F.3d at 1084; *see Conoco Inc. v. FERC*, 90 F.3d 536, 544 (D.C. Cir. 1996). Accordingly, we deny the petitions inasmuch as FERC considered the appropriate factors under the primary function test and sufficiently explained its reasoning.

## I.

Section 1(b) of the NGA distinguishes between facilities that are used for "the transportation of natural gas in interstate commerce," which are subject to FERC's jurisdiction, and those used for "gathering," which are not. 15 U.S.C. § 717(b). "Gathering" is generally defined as "the process of taking natural gas from the wells and moving it to a collection point for further movement through a pipeline's principal transmission system." *Conoco*, 90 F.3d at 539 n.2 (citing *Northwest Pipeline Corp. v. FERC*, 905 F.2d 1403, 1404 n.1 (10th Cir. 1990)). Although "[t]he line between jurisdictional transportation and nonjurisdictional gathering is not always clear," *Conoco*, 90 F.3d at 542, it is central to this case.

Since 1983, FERC has used a multi-factor "primary function test" to determine "whether a facility is devoted to the collection of gas from wells — gathering — or to the further ('downstream') long-distance movement of gas after it has been collected — interstate transportation." *Conoco*, 90 F.3d at 543 (citing *Farmland Indus., Inc.*, 23 F.E.R.C. ¶ 61,063, at 61,143 (1983); *Amerada Hess Corp.*, 52 F.E.R.C. ¶ 61,268, at 61,987–88 (1990)). Under the primary function test, FERC considers six physical criteria: (1) the pipelines' length and diameter; (2) the central point in the field; (3) the facility's geographic configuration or pattern; (4) the location of compressors and processing plants, particularly where the pipelines are located behind the plant; (5) the location of wells along all or part of the facilities; and (6) the line's operating

pressure. *ExxonMobil*, 297 F.3d at 1077 (citing *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1196 (D.C. Cir. 2000)). FERC also accounts for certain nonphysical factors, including: (1) the facility's purpose, location, and operation; (2) the pipeline owner's general business activity; (3) the objectives of the NGA and other pertinent legislation; and (4) the changing technical and geographic nature of exploration and production activities. *ExxonMobil*, 297 F.3d at 1077. No single criterion is dispositive, and not all of the factors apply in all situations. *Id.* (citing *Williams Field Servs. Group, Inc. v. FERC*, 194 F.3d 110, 116 (D.C. Cir. 1999); *Conoco*, 90 F.3d at 543).

FERC initially developed the primary function test for classifying onshore facilities, and it later modified the test in considering the increasing number of pipelines that were being constructed offshore on the Gulf of Mexico's Outer Continental Shelf ("OCS"), where gathering and distribution patterns are somewhat different. *ExxonMobil*, 297 F.3d at 1077 (citing *EP Operating Co. v. FERC*, 876 F.2d 46 (5th Cir. 1989)). Because offshore pipelines often must transport raw gas over longer distances, FERC adopted a "sliding scale" approach that permitted gathering pipelines of greater length and diameter in correlation with distance from shore and water depth. *ExxonMobil*, 297 F.3d at 1078 (citing *Amerada Hess*, 52 F.E.R.C. at 61,988). When FERC applied this modified approach in determining that the Sea Robin Pipeline Company's pipelines were jurisdictional transmission facilities, the Fifth Circuit reversed, questioning FERC's heavy emphasis on the facilities' size and on nonphysical factors and inviting FERC to reformulate its primary function test in light of the "physical, geographical and operational characteristics of pipelines in the OCS." *Sea Robin Pipeline Co. v. FERC*, 127 F.3d 365, 369–71 (5th Cir. 1997). On remand, FERC determined that the "behind-the-plant" test is not determinative of the gathering question offshore, and that instead it would look at the offshore system's configuration to locate a central point where gas is aggregated for transportation onshore. *Sea Robin Pipeline Co.*, 87 F.E.R.C. ¶ 61,384, at 62,425 (1999) (*Sea Robin II*). FERC explained that this

central aggregation point is analogous to the "central-point-in-the-field" criterion for onshore systems and should be "given weight in identifying the demarcation point between gathering and transportation on OCS pipeline systems." *Id.* at 62,426. FERC also emphasized that it would focus primarily on physical factors, according only secondary importance to nonphysical factors. *Sea Robin Pipeline Co.*, 92 F.E.R.C. ¶ 61,072, at 61,284 (2000). This court subsequently held that FERC reasonably applied its reformulated primary function test to the Sea Robin system. *ExxonMobil*, 297 F.3d at 1087.

It was against the backdrop of the evolving primary function test and the distinction between jurisdictional transmission and exempt gathering facilities that Transco and WGP filed the applications at issue. In the parlance of the oil and gas industry, a "spindown" occurs when a natural gas transporter transfers operation of its facilities to a gathering affiliate. *See Conoco*, 90 F.3d at 541. In 1996, Transco sought FERC's authorization, pursuant to NGA section 7(b), 15 U.S.C. § 717f(b), to spin down a number of its facilities to WGP as part of a comprehensive corporate restructuring plan. Transco's application covered a large number of its facilities on seven different pipeline systems in Texas and Louisiana and offshore on the OCS. On the same day, WGP petitioned FERC for an order declaring that the facilities it intended to acquire from Transco — most of which FERC had previously certificated as transmission facilities under section 7(c) of the NGA — were gathering facilities exempt from its jurisdiction under section 1(b).

FERC dismissed the comprehensive application without prejudice. *Transcon. Gas Pipeline Corp.*, 76 F.E.R.C. ¶ 61,-317, at 62,543 (1996) ("*Comprehensive Order*"). FERC observed that "[t]he physical parameters of the subject facilities are massive and complex, involving over 3,100 miles of pipeline," and that the number of facilities included in Transco's application "is without precedent in prior 'spin-down' cases." *Id.* (footnote omitted). Explaining that important differences existed among the many pipelines that Transco included in its application, and that, "[a]t the very minimum, large portions of the facilities are clearly properly classified as jurisdictional

transmission facilities," *id.* at 62,543, FERC also noted that "a decision to grant the requested abandonment in this case could set a precedent for ending NGA jurisdiction on the OCS, as it is likely that virtually every similar interstate pipeline on the OCS then would file a similar application." *Id.* at 62,542. Because "[n]either Transco nor WGP included in [its] pleadings an alternative request that [FERC] find specific parts of the facilities to be . . . nonjurisdictional," FERC dismissed the comprehensive application while stating that Transco and WGP could still file "another proposal requesting that [FERC] consider discrete portions of the facilities . . . to be gathering." *Id.* at 62,543. FERC denied the request for rehearing, noting that "the parties [did] not seek to parse the Transco facilities; rather, they continue[d] to insist that [FERC] should find all the facilities at issue to be gathering." *Transcon. Gas Pipe Line Corp.*, 95 F.E.R.C. ¶ 61,396, at 62,475–76 & n.3 (2001) ("*Comprehensive Rehearing Order*").

Transco and WGP then filed three sub-spindown applications seeking permission to abandon and to reclassify discrete portions of the Transco systems. FERC approved the spindown of the North Padre Island and Central Texas Systems. *Transcon. Gas Pipe Line Corp.*, 96 F.E.R.C. ¶ 61,115, at 61,429 (2001) ("*North Padre/Central Texas Order*"). Relying on the reformulated primary function test set forth in *Sea Robin II*, 87 F.E.R.C. ¶ 61,384 (1999), FERC determined that each system featured a central aggregation point demarcating gathering and transmission functions. *North Padre/Central Texas Order*, 96 F.E.R.C. at 61,440–41 (2001). FERC applied similar reasoning in approving Transco's abandonment of portions of the North High Island and West Cameron systems, again pinpointing central aggregation points and identifying some, but not all, of the pipelines as serving gathering functions. *Transcon. Gas Pipe Line Corp.*, 96 F.E.R.C. ¶ 61,118, at 61,449, 61,458–60 (2001) ("*North High Island/West Cameron Order*"). Finally, FERC approved Transco's requested abandonment of the Central Louisiana facilities and, upon locating a central aggregation point at Vermilion Block 67, designated part of the system as gather-

ing. *Transcon. Gas Pipe Line Corp.*, 96 F.E.R.C. ¶ 61,246, at 61,966 (2001) ("*Central Louisiana Order*"). Transco and WGP sought rehearing of those portions of the orders that designated parts of the systems as transmission facilities, and the Producers sought rehearing of the gathering determinations. FERC denied the rehearing requests. *Transcon. Gas Pipe Line Corp.*, 97 F.E.R.C. ¶ 61,296 (2001), *order on reh'g, North Padre/Central Texas Order*; *Transcon. Gas Pipe Line Corp.*, 97 F.E.R.C. ¶ 61,298 (2001), *order on reh'g, Central Louisiana Order*; *Transcon. Gas Pipe Line Corp.*, 97 F.E.R.C. ¶ 61,300 (2001), *order on reh'g, North High Island/West Cameron Order*.

## II.

Transco and WGP contend that FERC erred in rejecting their initial comprehensive application and improperly determined in the sub-spindown proposals that portions of the facilities were transmission rather than gathering. In considering these objections, the court will sustain FERC's factual findings if they are supported by "substantial evidence," 15 U.S.C. § 717r(b); *Louisiana Ass'n of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d 1101, 1115 (D.C. Cir. 1992) (per curiam), and will set aside FERC's actions if they are arbitrary and capricious, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court also applies *Chevron*'s familiar two-step framework to FERC's interpretation of section 1(b) of the NGA. *Exxon-Mobil*, 297 F.3d at 1083 (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984)). Moreover, the court is mindful that in "evaluating and balancing the several factors under the primary function test, [FERC] brings to bear its considerable expertise about the natural gas industry." *Conoco*, 90 F.3d at 544 (citations omitted). Consequently, "[t]he burden is on the petitioners to show that [FERC's] choices are unreasonable and its chosen line of demarcation is not within a 'zone of reasonableness' as distinct from the question of whether the line drawn by [FERC] is 'precisely right.'" *ExxonMobil*, 297 F.3d at 1084 (citations omitted).

**A.**

According to Transco and WGP, FERC misconstrued the comprehensive application as an "all or nothing" request — in other words, FERC misunderstood Transco and WGP as requesting that FERC allow them to abandon and reclassify all of their facilities or none at all. Transco and WGP maintain that their filings contained no such "all-or-nothing" contingency. Because Transco and WGP failed to object to FERC's all-or-nothing characterization in seeking rehearing, they are precluded from raising this argument here. Section 19(b) of the NGA, 15 U.S.C. § 717r(b), bars the court from considering on review any objection that was not raised on rehearing, without good cause shown. *Fed. Power Comm'n v. Colorado Interstate Gas Co.*, 348 U.S. 492, 497–99 (1955); *ASARCO v. FERC*, 777 F.2d 764, 774–75 (D.C. Cir. 1985). Transco and WGP sought rehearing, challenging FERC's denial of the comprehensive application on a number of grounds, but, despite FERC's invitation to clarify that they were making an alternative request that FERC find that some parts of the facilities perform a gathering function, Transco and WGP nowhere requested that FERC sever the comprehensive application. Having filed a rehearing request that implicitly accepted the *Comprehensive Order*'s all-or-nothing understanding, and not having shown good cause for failing to raise their severance argument before the agency, Transco and WGP are barred from challenging that understanding before the court. *See ASARCO*, 777 F.2d at 775.

FERC therefore was forced either to declare that all of the facilities at issue performed a gathering function or to deny the comprehensive application altogether. In this posture, jurisdiction and merits overlap, for the court must consider the merits of FERC's decision that at least one of the facilities performed a transmission function, thereby precluding approval of the all-or-nothing petition. FERC's decision in the *Comprehensive Order* was driven by the primary function analysis: FERC considered the relevant factors — including pipeline size and length, volume of gas, and water depth — and relied on no irrelevant factors. *Comprehensive Order*, 76 F.E.R.C. at 62,542–43 & nn.9–12. Transco and

WGP contend that FERC was preoccupied with size, without regard to the "sliding scale" analysis required by *EP Operating*, 876 F.2d at 48–49. On the contrary, FERC's orders demonstrate that FERC was concerned with the transmission function of the pipelines located closest to shore, in the shallowest waters, *id.* at 62,543 — precisely the type of analysis contemplated by the sliding scale approach, *Exxon-Mobil*, 297 F.3d at 1078 (citing *Amerada Hess*, 52 F.E.R.C. at 61,988). Specifically, FERC found that Transco and WGP had "not adequately explained how . . . existing interstate pipeline facilities that are not located in deep OCS waters, i.e., waters in excess of 200 meters, can properly be reclassified as gathering lines under the 'primary function' test." *Comprehensive Order*, 76 F.E.R.C. at 62,543. In light of this analysis, it was reasonable for FERC to conclude that, "[a]t the very minimum, large portions of the facilities are clearly properly classified as jurisdictional transmission facilities." *Id.*

**B.**

Regarding two of the three sub-spindown proposals, Transco and WGP contend that FERC erred by failing to recognize the physical realities of gathering exhibited by all of the pipelines addressed in the *Central Louisiana Order* and the *North High Island/West Cameron Order*, and thus failed properly to apply the modified primary function test for offshore gathering systems. *See EP Operating Co.*, 876 F.2d at 48–49; *Amerada Hess*, 52 F.E.R.C. ¶ 61,268 (1990).

Transco and WGP contend that the *Central Louisiana Order* was in error for two primary reasons. First, they claim that FERC neglected to apply *Amerada Hess*'s sliding-scale approach, which was designed to "allow the use of gathering pipelines of increasing lengths and diameters in correlation to the distance from shore and the water depth of the offshore production area." *Amerada Hess*, 52 F.E.R.C. at 61,988. Transco and WGP maintain that FERC failed to recognize that the Central Louisiana system's spine-and-lateral configuration is characteristic of a gathering function,

regardless of whether the system is on- or offshore, and that the offshore pipelines are longer and larger only because of the distances involved, not because their function is different. Second, Transco and WGP contend that in concluding that Vermilion Block 67 marks the central aggregation point at which the offshore lines convert from gathering to transmission, FERC ignored the fact that the offshore pipelines are part of the spine-and-lateral gathering system, and that the Cow Island Junction is the proper point of central aggregation.

Because "[i]t is for [FERC], in the first instance, to determine the patterns of gathering and transportation in the offshore context," the court is "generally 'unwilling to review line-drawing performed by [FERC] unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem.'" *ExxonMobil*, 297 F.3d at 1085 (quoting *Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998)). The *Central Louisiana Order* makes clear that FERC properly considered the facilities' diameter (sixteen and twenty inches), length (forty-two miles), and the source of the pipelines' pressure (from the wellhead), as well as the absence of processing plants (which, FERC explained, means little offshore). 96 F.E.R.C. at 61,976. Transco and WGP have not carried their burden of showing that FERC's determination falls outside of a "zone of reasonableness." *ExxonMobil*, 297 F.3d at 1084. The court in *ExxonMobil* affirmed FERC's use of the central-aggregation-point test for offshore systems, *id.* at 1087, and a map of the Central Louisiana system shows that FERC reasonably concluded that the entire system features two aggregation points — one at Vermilion Block 67 and the other at Cow Island Junction. Given the system's configuration — a spine-and-lateral system in which many smaller pipelines branch off of a central "spine" — it was permissible for the Commission to find that some of the pipelines assume a transmission function when they converge at Vermilion Block 67, while others serve a gathering purpose until they reach Cow Island. 96 F.E.R.C. at 61,977. "Reasonable people may disagree as to where gathering ends and

transportation begins," and this court will not substitute its judgment for a FERC determination that is not "patently unreasonable." *ExxonMobil,* 297 F.3d at 1085; *see also Conoco*, 90 F.3d at 544.

The same deference principles apply to FERC's findings in the *North High Island/West Cameron Order*. This system is shaped like an inverted "Y" with two "legs" — the North High Island pipelines to the west and the West Cameron pipelines to the east — that converge onshore at the Station 44/Cameron Meadows complex. FERC determined that only a portion of the North High Island subsystem is nonjurisdictional, locating a central aggregation point at Block 10, *North High Island/West Cameron Order*, 96 F.E.R.C. at 61,458–59, and that the entirety of the West Cameron subsystem serves a transmission function, *id.* at 61,459. Transco and WGP contend that FERC erred by evaluating the east and west legs independently rather than treating the Station 44/Cameron Meadows complex as the central aggregation point. According to Transco and WGP, the entire system, like the *Sea Robin* system, must be evaluated as a whole, and FERC cannot view each leg of the "Y" independently. But FERC explained that the two subsystems "generally operate independently, with the North High Island facilities collecting gas from the west in Offshore Texas and the West Cameron facilities collecting gas from the east in Offshore Louisiana." *Id.* at 61,458. Then, in assessing each subsystem, FERC noted the differences between the two. FERC reasonably concluded, in light of these differences, that the subsystems serve transmission functions before converging at the Station 44/Cameron Meadows complex. As in *ExxonMobil*, it was permissible for FERC to conclude "that different parts of the system required different jurisdictional treatment." *ExxonMobil*, 297 F.3d at 1085.

Transco and WGP next contend that FERC improperly designated a central aggregation point on the North High Island facility rather than finding the whole facility to be gathering. FERC explained that "[t]he North High Island subsystem consists of approximately 174 miles of 4 to 30–inch pipeline," most of which is "relatively small, with the lines

ranging from 4 to 24–inches in diameter." *North High Island/West Cameron Order*, 96 F.E.R.C. at 61,458. "The longest segment is a 63 mile, 24–inch Line C that connects all the upstream facilities with the plant complex onshore." *Id.* FERC concluded that "[a]lthough the North High Island Block 10 point does not exhibit as strong an indication of a marked physical change in facilities as was the case in *Sea Robin*," the interconnection of the 24–inch Line C with a 12–mile, 16–inch line at Block 10 nonetheless "serves as the central point of aggregation for the subsystem, where all the gas gathered upstream is delivered to a single point for transportation onshore." *Id.* at 61,458–59. In reaching this conclusion, FERC considered the length and diameter of the pipeline, the volume of gas transmitted, the shape of the subsystem, and the gas pressure. *Id.* at 61,459. Given that FERC considered the pertinent factors, its conclusion was not arbitrary and capricious. *See Conoco*, 90 F.3d at 544.

Transco and WGP further contend that FERC erred in concluding that all of the West Cameron facility is transmission. In assessing the West Cameron facility, FERC considered the length, diameter, and pressure of the pipeline on the West Cameron subsystem; the location of wells and lack of processing plants along the line; and the shape of the long, continuous pipeline connecting production in the OCS to the onshore processing facilities. *North High Island/West Cameron Order*, 96 F.E.R.C. at 61,459–60. Based on these factors, FERC found "that the West Cameron subsystem's primary function is that of a transmission facility, not a gathering one." *Id.* at 61,460. This conclusion was not arbitrary and capricious.

Transco and WGP contend, finally, that FERC failed to comply with its own precedent when it ignored the historical evolution of the Central Louisiana and North High Island/West Cameron systems in determining their primary function. In *Enron Gulf Coast Gathering L.P.*, 95 F.E.R.C. ¶ 61,318 (2001), FERC stated that the fact that the pipelines in question "were built in separate stages over a number of years after" the original system's construction "in order to access new gas supplies on the OCS also speak[s] to their

13

primary gathering function." *Id.* at 62,097 (footnote omitted). Transco and WGP contend that, consistent with that precedent, they presented FERC with detailed evidence showing that the systems' history and evolution suggest a primary gathering function. But FERC did not err in according little weight to this factor. Although FERC recognized in *Enron* that the historical evolution of the pipeline system may be relevant, it has not traditionally been a criterion in the primary function test. *See ExxonMobil*, 297 F.3d at 1077. Moreover, as FERC notes, the Fifth Circuit instructed FERC to afford nonphysical factors, such as a system's historical evolution, only secondary importance. *Sea Robin*, 127 F.3d at 371. In any event, this court has observed that "the historical classification" of a system is "of limited utility" in " 'the wake of major regulatory changes in the natural gas industry' " effected by Order No. 636, *Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation and Regulation of Natural Gas Pipelines After Wellhead Decontrol*, F.E.R.C. Stats. & Regs. ¶ 30,939, *reh'g granted in part*, Order No. 636–A, F.E.R.C. Stats. & Regs. ¶ 30,950, *reh'g denied*, Order No. 636–B, 61 F.E.R.C. ¶ 61,272 (1992), *aff'd in part, rev'd in part sub nom. United Distrib. Cos. v. FERC*, 88 F.3d 1105 (1996) (per curiam) ("Order No. 636"). *ExxonMobil*, 297 F.3d at 1086–87 (quoting *Conoco*, 90 F.3d at 539). For reasons we explain in Part III, this analysis applies to Transco's facilities. Thus, FERC did not err in declining to classify the lines as gathering on the basis of their historical evolution.

## III.

The Producers challenge approval of the abandonment and reclassification of Transco's facilities on the grounds that FERC: (1) failed to find that a change in circumstances justified revisiting an earlier classification of Transco's facilities as gathering; (2) misapplied the reformulated primary function test; and (3) neglected to conduct a sufficient public interest analysis. Each of these contentions lacks merit.

FERC has stated that "[e]xisting interstate pipelines and gathering facilities [will] retain their status barring some change in circumstances. . . ." *Gas Pipeline Facilities and Services on the Outer Continental Shelf*, 74 F.E.R.C. ¶ 61,222, at 61,757 (1996) ("*OCS Policy Statement*"). According to the Producers, Transco requested in 1990 that FERC certificate its facilities as transmission when Transco was restructuring from a merchant to a transporter. Because FERC granted Transco's request, the Producers maintain, the *OCS Policy Statement* required FERC to find that a change in circumstances justified revisiting the certification decision.

FERC explained in the orders on review that Order No. 636, which promoted the unbundling of pipeline services, effected significant changes in the industry, and that those changes justified Transco's abandonment request. *E.g., North Padre/Central Texas Order*, 96 F.E.R.C. at 61,434. FERC noted that Transco had sought to certificate its pipelines as transmission at a time when "Transco did not have a need to precisely distinguish between jurisdictional transmission and exempt gathering facilities," because those services could be bundled. *Id.* at 61,431. But "Transco, like many interstate pipelines, found after restructuring its system consistent with Order No. 636, and moving from a bundled, merchant function to an unbundled, transportation function, that it no longer needed all of its existing system facilities." *Id.* at 61,434. FERC accordingly found that Transco's requested spindown was reasonable "because [its] facilities are no longer necessary for the service it currently provides." *Id.*

FERC's explanation is consistent with the major industry changes wrought by Order No. 636. In *ExxonMobil*, for instance, the petitioners complained that FERC failed "to give weight to the previously 'settled status' of the classification of [the facilities in question] as engaged in jurisdictional transportation." *ExxonMobil*, 297 F.3d at 1086. But the court observed that "[w]hen interstate gas pipelines served the multi-function role of purchasing, gathering, transporting, and re-selling natural gas, *i.e.* bundled sales, the transportation/gathering jurisdictional question may have been of less

consequence." *Id.* (citation omitted). The court then explained that FERC "has been struggling with the reclassification of facilities in the wake of the unbundling of gas sales and interstate transportation in Order No. 636." *Id.* at 1087 (citing *Conoco*, 90 F.3d at 539–41). Because Order No. 636 took effect after Transco's certification, the changes effected by the Order then were sufficiently significant to justify FERC's revisiting of Transco's classifications. The Producers object that if this rationale is accepted, then all prior determinations of transmission/gathering status could potentially be reopened, thereby upsetting producers' reliance and repose interests. Even so, the objection confirms the understanding that Order No. 636 worked a substantial change in the industry; it does not provide a reason for declining to revisit Transco's certification.

Furthermore, in light of the court's upholding in *ExxonMobil*, 297 F.3d at 1087, of FERC's modified primary function test as reasonable, the Producers' contention that FERC's orders are founded on a flawed reformulation of the primary function test necessarily fails. Similarly, the Producers' contention that FERC misapplied the primary function test by according determinative weight to the central-aggregation-point factor also fails. Although FERC maintains that the Producers waived this challenge by failing to raise it on rehearing, *see* 15 U.S.C. § 717r(b); *Colorado Interstate Gas*, 348 U.S. at 497–99; *ASARCO*, 777 F.2d at 774–75, their argument before FERC that it erred in selecting the specific points along Transco's system where gathering ends and transmission began was sufficient to preserve the objection. While the Producers maintain that FERC erred in finding that virtually all facilities located upstream from the central aggregation point are gathering and in failing to reconcile its conclusions with prior precedents, the orders demonstrate that FERC adequately considered a range of relevant factors — the facilities' length and diameter, the volume of gas transmitted, the pipelines' configuration, the location of compression facilities and processing plants, the source of pressure, and the presence of a central aggregation point. *North Padre/Central Texas Order*, 96 F.E.R.C. at 61,440–42; *North*

*High Island/West Cameron Order*, 96 F.E.R.C. at 61,458–60; *Central Louisiana Order*, 96 F.E.R.C. at 61,976–77. FERC did "not consider any one factor to be determinative," *North Padre/Central Texas Order*, 96 F.E.R.C. at 61,442, and its determinations were consistent with prior precedent. Although the Producers contend that FERC's decisions in *Seahawk Shoreline System*, 93 F.E.R.C. ¶ 61,097 (2000), *reh'g denied*, *Seahawk Transmission Co.*, 95 F.E.R.C. ¶ 61,342 (2001), and *Venice Gathering Co.*, 97 F.E.R.C. ¶ 61,045 (2001), are dispositive because the size of those pipelines was the same as the size of Transco's facilities, other relevant differences remain, including the systems' proximity to shore and their connections to other lines. Hence, "it is entirely appropriate for FERC to proceed on a case-by-case basis.…" *ExxonMobil*, 297 F.3d at 1087 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947)). FERC gave reasoned consideration to each of the pertinent factors, and its factual conclusions are supported by substantial evidence in the record. *ExxonMobil*, 297 F.3d at 1084 (citations and quotations omitted).

Producers finally contend that even if the facilities are properly classified as gathering, the NGA required FERC to make a public interest finding before permitting Transco to abandon the facilities by sale to a nonjurisdictional affiliate. *See* 15 U.S.C. § 717f(b); *Transcon. Gas Pipe Line Corp. v. Fed. Power Comm'n*, 488 F.2d 1325, 1328 (D.C. Cir. 1973) (per curiam); *Michigan Consol. Gas Co. v. Fed. Power Comm'n*, 283 F.2d 204, 214 (D.C. Cir. 1960). The Producers explain that the facilities in question were certificated as transmission, and the abandonment of certificated facilities is subject to FERC's public interest standard. In a public interest analysis, "the burden of proof is on the applicant for abandonment to show that the 'public convenience and necessity' permits abandonment, that is, that the public interest 'will in no way be disserved' by abandonment." *Transcon. Gas*, 488 F.2d at 1328 (quoting *Michigan Consol.*, 283 F.2d at 214). The Producers contend that FERC failed adequately to consider the anti-competitive effects of Transco's abandonment.

In FERC's view, "the issue of competition" is not "relevant to whether or not [FERC] will regulate an affiliated gatherer's rates or terms and conditions of service after it acquires abandoned facilities," because FERC "has no authority under the NGA to regulate a gatherer's rates or its terms and conditions of service." *North High Island/West Cameron Order*, 96 F.E.R.C. at 61,454 (citing *Conoco*, 90 F.3d 536). Put more simply, "NGA § 7(b) does not require [FERC] authorization for a transfer of gathering facilities." Respondent's Br. at 50. As the court has explained, "section 7(b) only applies to jurisdictional facilities, and 'do[es] not expand [FERC's] § 1(b) jurisdiction.'" *ExxonMobil*, 297 F.3d at 1088 (quoting *Conoco*, 90 F.3d at 553); accordingly, the petitioner in *ExxonMobil* could not use section 7(b) to "bootstrap" FERC jurisdiction over a set of gathering facilities that the petitioner sought to reclassify (but not to abandon). *Id.* Although the situation here is slightly different than in *ExxonMobil*, because Transco wishes to abandon its pipelines rather than simply reclassify them, FERC properly determined that under NGA section 7(b) it had no discretion to deny abandonment of Transco's facilities that it found were primarily functioning as gathering. *See, e.g.*, *North Padre/Central Texas Order*, 96 F.E.R.C. at 61,435. We part company with the Fifth Circuit's opinion in *Pacific Gas & Electric Co. v. FERC*, 106 F.3d 1190 (5th Cir. 1997), to the extent it holds that FERC has discretion to examine whether abandonment would be in the public interest, *id.* at 1197, for once FERC determines that a facility is not dedicated to a jurisdictional function, it has no authority to exercise jurisdiction over that facility by denying the certificate of abandonment for that facility.

As to shippers' anti-competition concerns, FERC explained that even though it lacked the authority to deny the abandonment, the concerns were unfounded because the abandonment was "consistent with the unbundling policies of Order No. 636 and should, in the long run, promote competition within the gathering industry." *North High Island/West Cameron Order*, 96 F.E.R.C. at 61,454 (citing *Northern Natural Gas Co.*, 93 F.E.R.C. ¶ 61,101, at 61,273 (2000)). FERC further noted

that "the facilities at issue here are located on the OCS and will become subject to the [Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–56 (2000),] upon approval of the spindown," thereby limiting any potential anti-competitive effects. *North Padre/Central Texas Order*, 96 F.E.R.C. at 61,435. Under FERC's OCSLA regulations, WGP is required to report the terms under which it provides service to shippers; a shipper can file a complaint if it believes either Transco or WGP has violated its statutory obligations and "the Commission will investigate any such complaint in a timely manner." *Id.* (citing 18 C.F.R. § 332.2, 332.206 (2000)). Thus, FERC has taken the long view, concluding that Order No. 636's unbundling policies create competitive conditions and that, combined with the standards of conduct for gathering facilities in Transco's tariff, the OCSLA sufficiently guards against the exercise of monopoly power. *See United Distrib. Cos.*, 88 F.3d at 1139.

Accordingly, because the court is " 'generally unwilling to review line-drawing performed by [FERC] unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem,' " *ExxonMobil*, 297 F.3d at 1085 (quoting *Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998)), and FERC's conclusions were reasonable, we deny the petitions for review.